United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 20, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-20655

_____


BENCHMARK ELECTRONICS, INC.,

Plaintiff-Appellant,

versus

J.M. HUBER CORPORATION,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____


Before REAVLEY, JOLLY, and, JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Benchmark Electronics, Inc. (Benchmark) sued J.M. Huber
Corporation (Huber) after a Huber subsidiary that Benchmark
purchased lost significant customers and experienced a catastrophic
income decline. Benchmark alleged the breach of various contract
provisions, fraud, and negligent misrepresentation. Responding to
dispositive motions by the parties, the district court treated
Huber's motion for judgment on the pleadings as a motion for
summary judgment, applied New York law to all of Benchmark's

claims, and granted summary judgment and dismissal on the pleadings for Huber. We conclude that while New York law governs Benchmark's breach of contract claims pursuant to the parties' contractual choice, Texas law governs its fraud and negligent misrepresentation claims. Further, Benchmark's fraud and misrepresentation pleadings withstand a lack of particularity challenge under Rule 9(b). Accordingly, we vacate the judgment and remand the case for further proceedings.[*]

## I. BACKGROUND

In August 1999, Benchmark, a Texas corporation with its principal place of business in Angleton, Texas, purchased the stock of AVEX, a contract manufacturer for the electronics industry headquartered in Alabama. Huber, the seller, is a New Jersey corporation with its principal place of business in Edison, New Jersey. Huber put Avex on the market after it suffered heavy operating losses in 1997 and 1998. In April 1999, a Huber representative met with Benchmark representatives in Texas to promote AVEX's sale, but he did not disclose any substantive information about the company because Benchmark had not yet signed a confidentiality agreement. Huber retained New York investment banking and law firms to facilitate the AVEX transaction.

In May, Benchmark signed a Confidentiality Agreement in which it agreed that only representations and warranties in a

_____

[*]Judge Reavley concurs in the judgment only.

2

definitive agreement between the parties would have any legal effect. Huber then sent Benchmark executives in Texas a Confidential Descriptive Memorandum about the potential AVEX acquisition that touted AVEX's current and expected customer relationships and profitability. After Benchmark officially expressed interest in purchasing AVEX, Huber allowed Benchmark access to data rooms in New York that contained information regarding AVEX, its operations, contracts, customers, and historical financial performance. Benchmark also interviewed AVEX customers as part of its due diligence. From June to August, Huber representatives and AVEX executives authorized to speak for Huber made representations regarding AVEX's profitability in telephone conversations with Benchmark representatives in Texas.

Because Benchmark could not, despite its due diligence, verify Huber's representations regarding AVEX's renewed profitability and the strength of its customer relationships, it negotiated a series of representations and warranties in the parties' Stock Purchase Agreement. Huber disclaimed all other representations and warranties.

In June, Benchmark and Huber representatives and their counsel met in New York for a negotiating session. Further negotiations took place by teleconference with Benchmark representatives in Texas. Huber's counsel sent drafts of the agreement to Benchmark in Texas, and Benchmark's attorneys proposed revisions to the agreement from Houston. At a final negotiating

session in New York, Huber agreed to sell AVEX to Benchmark for $255 million in cash, subject to a working capital adjustment, plus one million shares of Benchmark stock worth approximately $34 million. The parties executed the Original Stock Purchase Agreement in New York and an Amended Stock Purchase Agreement (Agreement) in their respective home states. A formal closing took place in New York in August 1999.

Contrary to Huber's representations, several AVEX customers allegedly reduced or discontinued their purchases from AVEX in 1999 before the sale closed, and AVEX allegedly suffered significant operational losses.

Benchmark's lawsuit against Huber alleged fraud, negligent misrepresentation, and breach of contract claims. The district court ordered Benchmark to file various documents in support of its fraudulent misrepresentation claims, a bill of particulars, and a page on each material adverse change in AVEX's business condition; it also ordered Huber to file a counter-explanation. The district court next ordered mediation. When mediation failed, the court ordered Huber to file a motion for summary judgment, but Huber, instead, sought partial summary judgment urging application of New York law and judgment on the pleadings on all of Benchmark's claims. Benchmark filed a cross motion for partial summary judgment, asserting that Texas law governs its noncontractual claims and that Huber is liable for statutory fraud and breach of the contractual warranty in § 3.7 of

4

the Agreement. The district court treated Huber's motion for judgment on the pleadings as a motion for summary judgment, applied New York law, granted Huber's motions, and denied Benchmark's motions. Benchmark timely appealed.

## II. DISCUSSION

### A. Sufficiency of Benchmark's Pleadings

As a preliminary matter, we turn to the district court's decision that Benchmark failed to plead its fraud and negligent misrepresentation claims with the particularity required by Federal Rule of Civil Procedure 9(b). Although Rule 9(b) by its terms does not apply to negligent misrepresentation claims, this court has applied the heightened pleading requirements when the parties have not urged a separate focus on the negligent misrepresentation claims. Williams v. WMX Techs., Inc., 112 F.3d 175, 177 (5th Cir. 1997). That is the case here, as Benchmark's fraud and negligent misrepresentation claims are based on the same set of alleged facts.

"What constitutes 'particularity' will necessarily differ with the facts of each case . . . ." Guidry v. Bank of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d

1134, 1139 (5th Cir. 1992) (internal quotation marks and citation omitted). Put simply, Rule 9(b) requires "the who, what, when, where, and how" to be laid out. <u>Williams</u>, 112 F.3d at 179. Review of a dismissal for failure to comply with Rule 9(b) is de novo. <u>United States ex rel. Russell v. Epic Healthcare Mgmt. Group</u>, 193 F.3d 304, 308 (5th Cir. 1999).

Benchmark's final complaint satisfies the pleading requirements of Rule 9(b). It alleges that a Huber representative[1] made false representations regarding AVEX's operations, financial results, and customer relations in April 1999 in Angleton, Texas. It also alleges false or misleading statements regarding favorable past financial results and the strength of its customer relations with Lucent, Compaq, General Instruments, and Ericsson in the Confidential Descriptive Memorandum sent on behalf of Huber to Benchmark in May 1999, in the information provided to Benchmark in the data rooms at the offices of Huber's investment bankers in June and July 1999, and in personal discussions between Huber representatives and Benchmark in June, July, and August 1999. Specifically, Timothy D. Boates, Gregor J. Smith, and Jeffrey Nesbitt allegedly were involved in the oral misrepresentations. The complaint also alleges fraud and negligent misrepresentation based on representations and warranties made in the Original Stock Purchase Agreement in July and in the Amended Stock Purchase

---

[1]The parties stipulated that the Huber representative was Mr. Michael Marberry.

Agreement in August that AVEX had encountered no material adverse change prior to closing, that AVEX had not received notice of default or termination under any significant contract, and that AVEX's proffered financial statements were accurate under generally accepted accounting principles.

In addition to setting forth the who, what, when, and where, Benchmark's complaint also explains why the various assertions are fraudulent or misleading. The complaint alleges, for example, that AVEX lost as customers General Instruments and Compaq, and that Ericsson, Lucent, and Phillips planned to dramatically reduce their purchases from AVEX. It also alleges that AVEX's financial statements materially overstated the company's financial condition and that, due to the misrepresentations, Huber was able to sell its stock to Benchmark, and Boates, Smith, and Nesbitt became entitled to substantial transaction incentive bonuses. Based on the foregoing, Benchmark's final complaint satisfies Rule 9(b)'s pleading requirements and sufficiently puts Huber on notice as to the challenged assertions.

**B.  Summary Judgment for Huber**

The district court awarded summary judgment to Huber in three stages. First, it converted, *sua sponte*, Huber's deliberately limited motion for judgment on the pleadings and for partial summary judgment on the application of New York law, into an all-encompassing defensive summary judgment motion. Second, it

7

held that New York law applied to the transaction and consequently deprives Benchmark of actionable fraud and misrepresentation claims. Third, it rejected Benchmark's cross-motion for summary judgment, and *sua sponte* awarded summary relief to Huber, based on various warranties contained in the AVEX sale contract. These rulings are incorrect and require the vacatur of the summary judgment along with a clarification of the claims that are preserved by Texas law.

### 1. Conversion to Summary Judgment

Huber filed a motion for partial summary judgment seeking application of New York law and a motion for judgment on the pleadings on all of Benchmark's claims. Benchmark contends, and we agree, that the district court erred by treating Huber's motion for judgment on the pleadings as a motion for summary judgment without providing Benchmark an opportunity to conduct discovery.

"[I]t is well-settled that a district court may grant summary judgment *sua sponte*, so long as the losing party has ten days notice to come forward with all of its evidence in opposition to summary judgment." Love v. Nat'l Med. Enters., 230 F.3d 765, 770-71 (5th Cir. 2000) (internal quotation marks and citation omitted). Although this court ordinarily reviews whether there was lack of the required notice for harmless error, Washington v. Resolution Trust Corp., 68 F.3d 935, 939 (5th Cir. 1995), "where the party against whom summary judgment is granted moves for

reconsideration under FED. R. CIV. P. 59(e), but does *not*, in that motion, challenge the procedural propriety of the summary judgment ruling, our court has reviewed the asserted procedural irregularity, raised for the first time on appeal, *only* for plain error." Love, 230 F.3d at 771. Benchmark did not specifically raise the procedural propriety of the district court's summary judgment ruling in its Rule 59(e) motion; we conclude that the district court plainly erred in converting Huber's motion for judgment on the pleadings to a summary judgment.

A "purpose of the Rule 56 notice requirement is that the summary judgment may not be used to cut off discovery." Clark v. Tarrant County, 798 F.2d 736, 746 (5th Cir. 1986). In Clark, conversion of a Federal Rule of Civil Procedure 12(b)(6) motion to summary judgment was proper when the court accepted evidence outside the pleadings and the appellants had a "full, fair, and wholly adequate opportunity for discovery" for more than sixteen months. Id.

In this case, the district court did not allow the parties full discovery. While it ordered Benchmark to file documents supporting its allegations of misrepresentations, it did not allow Benchmark the benefit of disclosures by Huber or other sources. When the district court ordered mediation, it stayed everything, including discovery, except for extraordinary emergency motions. After mediation failed, rather than enter a pretrial

scheduling order, as Benchmark had requested, the district court ordered Huber to move for summary judgment. Despite the court's order, Huber filed only a partial motion for summary judgment on the choice of law issue and moved for judgment on the pleadings on Benchmark's claims.

Huber specifically limited its motion on Benchmark's claims to judgment on the pleadings, explaining that the court need not convert its motion to summary judgment because the attached exhibits could be considered part of the pleadings. See Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."). The single affidavit submitted by Huber supported only its partial motion for summary judgment on the choice of law issue. When Benchmark requested the district court to lift the stay on discovery, Huber opposed the motion, arguing that discovery would be premature because Huber had "a Rule 12(c) motion for judgment on the pleadings pending. The ultimate issue on a motion for judgment on the pleadings is whether the plaintiff will be allowed to offer *any* evidence to support its claims."

Benchmark was equally careful to treat Huber's motion as a Rule 12 motion on the pleadings, agreeing that the court could consider Huber's exhibits without converting the motion to a

10

summary judgment. Benchmark did, however, move for partial summary judgment on two claims that we discuss below, breach of the contractual warranty found in § 3.7 of the Agreement and statutory fraud based on § 27.01 of the Texas Business and Commerce Code. Putting aside these two claims for the moment, we vacate summary judgment on Benchmark's other claims and remand for discovery. See Clark, 798 F.2d at 746. Although Huber asserts that Benchmark did not need discovery because it could have relied on the AVEX documents it owned after the acquisition, discovery in a highly fact intensive case like this is critical. Moreover, Benchmark was lulled into responding to Huber's peremptory motion without offering evidence, and was thus deprived of a full and fair opportunity to defend against summary judgment on its claims. The district court plainly erred in treating Huber's deliberately limited motion for judgment on the pleadings as a motion for summary judgment without allowing discovery.

### 2. Choice of Law

Pivotal to the merits of this case is the choice of law applicable to Benchmark's claims. According to the parties, either New York or Texas law governs their dispute. The district court held that New York law applies to the entire case. From this conclusion, it followed that New York substantive law affords Benchmark no claim for extracontractual fraud and misrepresentation claims. We hold that, because the parties entered into a narrow

choice of law clause, Texas law applies to and, at least conceptually, preserves some of those noncontractual claims.

To determine the applicable law, a federal court sitting in diversity applies the choice of law rules of the forum. Spence v. Glock, GES.m.b.H., 227 F.3d 308, 311 (5th Cir. 2000). Accordingly, Texas choice of law rules apply.

The parties' contract provides that the "Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York . . . ." Texas law gives effect to choice of law clauses regarding construction of a contract. In re J. D. Edwards World Solutions Co., 87 S.W.3d 546, 549 (Tex. 2002); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. c. We will therefore respect the parties' determination that their agreement be construed under New York law.

The contractual choice of law clause does not, however, address the parties' entire relationship; Benchmark's claims of fraud and negligent misrepresentation are not governed by the parties' narrow choice of law provision. The provision at hand is narrow because it deals only with the construction and interpretation of the contract. Huber relies on Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134 (5th Cir. 1992), in arguing that this court should apply New York law to Benchmark's tort claims. In Tel-Phonic, this court applied the parties' chosen law to breach of contract and fraud claims, concluding that "the Texas Supreme Court would follow the conflicts principle that the effect

12

of a misrepresentation or undue influence upon a contract is determined by the same law that governs the contract. *Restatement (Second) of Conflicts of Law* § 201 (1971)." Id. at 1142. Because Tel-Phonic does not quote the parties' choice of law language, we do not know the breadth of the provision at issue in that case.

When dealing with narrow choice of law provisions, Texas law requires an issue-by-issue choice of law analysis. In Stier v. Reading & Bates Corp., 992 S.W.2d 423, 433 (Tex. 1999), the Texas Supreme Court held that a provision stating that an "agreement shall be interpreted and enforced in accordance with the laws of the State of Texas, U.S.A. . . . applies only to the interpretation and enforcement of the contractual agreement. It does not purport to encompass all disputes between the parties or to encompass tort claims." See also Busse v. Pac. Cattle Feeding Fund #1, Ltd., 896 S.W.2d 807, 812-13 (Tex. App.--Texarkana 1995, writ denied) (provision that an "agreement and the rights and obligations of the parties arising hereto shall be construed in accordance with the laws of the State of Iowa" does not apply to claims under Deceptive Trade Practices Act, the Texas Securities Act, and the common law). This court's decisions in Thompson & Wallace of Memphis, Inc. v. Falconwood Corp., 100 F.3d 429, 433 (5th Cir. 1996), and Caton v. Leach Corp., 896 F.2d 939, 943 (5th Cir. 1990), are in accord. To the extent that Tel-Phonic is inconsistent with these cases, it has

13

been superseded by subsequent developments in Texas law and does not control.

Texas courts use the Restatement's "most significant relationship" test to decide choice of law issues. <u>Hughes Wood Prods., Inc. v. Wagner</u>, 18 S.W.3d 202, 205 (Tex. 2000). Three Restatement sections guide our analysis. Section 145(2)[2] provides the factors to be considered when applying the general choice of law principles set forth in § 6[3] to tort cases. Texas courts also apply the Restatement section specifically addressed to the issue at hand. <u>Id.</u> Although the Texas Supreme Court has not yet applied § 148,[4] the Restatement section specifically addressed to fraud and

---

[2]Restatement (Second) of Conflict of Laws § 145(2) provides:

Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

[3]Restatement (Second) of Conflict of Laws § 6 states that the factors relevant to choosing the applicable rule of law include:

(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

[4]Restatement (Second) of Conflict of Laws § 148(2) provides:

misrepresentation, the Texas Court of Appeals recently relied on Hughes in applying § 148 to determine the governing law in a misrepresentation case. Tracker Marine, L.P. v. Ogle, 2003 Tex. App. LEXIS 3084 (Tex. App.--Houston [14th Dist.] Apr. 10, 2003, no pet. h.).

Consideration of the relevant Restatement factors demonstrates that Texas law should govern Benchmark's fraud and misrepresentation claims. Although Huber hired New York attorneys and investment bankers, who provided data rooms for Benchmark's review in New York, and the parties executed the Original Stock Purchase Agreement, held a formal closing, and exchanged stock in New York, neither Benchmark nor Huber nor AVEX has any other mentioned connection to New York. On the other hand, many factors weigh in favor of the application of Texas law. Huber touted AVEX's profitability in a promotional memorandum sent to Benchmark

---

When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties: (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

15

representatives in Texas and in telephone conversations with representatives in Texas. Benchmark received drafts of the Stock Purchase Agreement in Texas, and participated in negotiations by conference call from Texas, and its attorneys drafted proposed revisions to the agreements in Texas. Benchmark representatives decided in Texas to purchase AVEX. The parties executed the Amended Stock Purchase Agreement in their respective home towns. Benchmark wired money from its Texas bank account to provide Huber the cash required under the Agreement. And as has been noted, Benchmark is a Texas company with its principal place of business in Angleton, Texas. The alleged injury occurred to Benchmark in Texas, and it arose from misrepresentations made in or directed to this state. Texas clearly has an interest in protecting its businesses from fraudulent activities.

In short, Texas has the dominant contacts with the parties and the transaction, while New York is an adventitious location, which, apart from the choice of law clause in the parties' contract, is simply the domain of the professionals Huber chose to represent it in selling AVEX. New York's undoubted interest in serving as the venue for significant financial transactions is less compelling than that of the home state of one of the parties. (No one urged application of New Jersey or Alabama law, corresponding to Huber's or AVEX's locations). Texas has the "most significant relationship" to Benchmark's fraud and misrepresentation claims.

16

**3.    Status of Benchmark's Fraud and Misrepresentation Claims**

Applying Texas law to Benchmark's fraud and misrepresentation claims mandates a different substantive analysis than the district court undertook.  We sketch the parameters of that analysis, which raises pure questions of law briefed by the parties, to expedite the case on remand.

Benchmark bases its fraud claims on (1) allegedly misleading information provided to Benchmark during negotiations and (2) Huber's alleged breach of contractual representations and warranties in the Agreement.  We conclude that the Stock Purchase Agreement's disclaimer bars Benchmark's claims based on un-warranted precontractual representations.  Texas law, however, allows Benchmark's common law and statutory fraud claims to proceed to the extent they are based on representations warranted in the Agreement.

The parties' Confidentiality Agreement and Stock Purchase Agreement each contains a disclaimer.  Pursuant to the agreements' choice of law provisions, New York law controls the validity of the disclaimers.  Under New York law, "[a] disclaimer is generally enforceable only if it 'tracks the substance of the alleged misrepresentation . . . .'"  Caiola v. Citibank, N.A., 295 F.3d 312, 330 (2d Cir. 2002) (quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 735 (2d Cir. 1984)); see also Harsco Corp. v. Segui, 91 F.3d 337, 345-48 (2d Cir. 1996).  Under

17

this standard, the disclaimer in the Confidentiality Agreement is too broad and general to be enforceable.[5]

By contrast, the disclaimer in the Stock Purchase Agreement[6] specifically <u>excludes</u>, and the agreement thus vouches for, representations made in "Article III", a thirteen-page, single-space section that incorporates by reference additional schedules and financial statements. The contractual representations cover, <u>inter alia</u>, AVEX's operations, financial results, and customer contracts, dealing with the same subject

---

[5]The Confidentiality Agreement states:

You acknowledge that Huber . . . make[s] no representation or warranty, express or implied, as to the accuracy or completeness of the Information and that Huber . . . undertake[s] no obligation to furnish you with access to any additional information. . . . You agree that Huber . . . shall have no liability to you or to any of your Representatives as a result of the use of the Information by you and your Representatives, it being understood that only those particular representations and warranties which may be made by Huber in a definitive agreement, when, as and if executed, and subject to such imitations and restrictions as may be specified in such definitive agreement, shall have any legal effect.

[6]Section 3.29 of the Stock Purchase Agreement, titled "Disclaimer of other Representations and Warranties," provides in pertinent part:

Except as expressly set forth in this Article III, Seller makes no representation or warranty, express or implied, at law or in equity, in respect of Seller, any of the AVEX Group or any of their respective assets, liabilities or operations . . . . Seller and the AVEX Group make no representations or warranties with respect to any projections, estimates or budgets delivered to or made available to Purchaser of future revenues or results of operations or any component thereof, future cash flow or future financial condition or with respect to any other documents made available to Purchaser with respect to the AVEX Group.

18

matter as Huber's precontractual representations.[7]  As the court held in Harsco Corp., supra, the specificity of what is warranted by Huber precludes Benchmark, a sophisticated business entity, from claiming reliance upon other precontractual representations covering the same subjects: ". . . the exhaustive nature of the . . . representations adds to the specificity of [Section 3.29]'s disclaimer of other representations.  We see no reason not to hold [Benchmark] to the deal it negotiated."  Harsco, 91 F.3d at 346.

Although, under the Stock Purchase Agreement's disclaimer, precontractual misrepresentations (covering anything other than the warranties in Article III) are not actionable by Benchmark, Texas law permits its allegations of fraudulent inducement or fraud arising from false representations contained in the contract to go forward.  Under Texas law, "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract."  Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998).  Statutory fraud claims under § 27.01 of the Texas

---

[7]Pertinent to Benchmark's fraud claims are the representations and warranties that AVEX had not encountered any material adverse change since December 31, 1998; that AVEX had not received written notice of default or termination under any significant contract; and that the proffered financial statements of AVEX are complete and accurate under generally accepted accounting principles.

Business and Commerce Code[8] can also be based on false contractual representations.  See SMB Partners, Ltd. v. Osloub, 4 S.W.3d 368 (Tex. App.--Houston [1st Dist.] 1999, no writ).  To the extent, therefore, that Benchmark bases its common law and statutory fraud claims on representations warranted in the Agreement, Texas law allows such claims.

Further, Texas law governs Benchmark's negligent misrepresentation claim.  On remand, the district court must determine whether Benchmark can assert a case for recovery under Texas law.  See, e.g., D.S.A., Inc. v. Hillsboro Indep. Sch. Dist., 973 S.W.2d 662, 663-64 (Tex. 1998); Fed. Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 443 (Tex. 1991).

### 4.   Benchmark's Cross-Motion for Summary Judgment

After Huber moved to dismiss Benchmark's claims on the pleadings, Benchmark moved for partial summary judgment, asserting Huber is liable for breach of several contract warranties.  The district court granted summary judgment in Huber's favor.  Although

---

[8]Section 27.01 of the Texas Business and Commerce Code provides in relevant part:

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
   (1) false representation of a past or existing material fact, when the false representation is
    (A) made to a person for the purpose of inducing that person to enter into a contract; and
      (B) relied on by that person in entering into that contract . . . .

a court may grant summary judgment against the moving party, <u>Landry v. G.B.A.</u>, 762 F.2d 462, 464 (5th Cir. 1985), we vacate the district court judgment. At this point, neither party is entitled to judgment as a matter of law.[9]

As one example of the district court's mistaken contractual analysis, Huber warrants in § 3.7 that "since December 31, 1998, there has not been any Material Adverse Change." The Agreement defines "Material Adverse Change" as a "material adverse change to the business, results of operations or financial condition of the AVEX Group taken as a whole." The parties disagree on the meaning of § 3.7 but each offers a reasonable interpretation of the provision. This contract interpretation issue, as discussed above, is governed by New York law. "Under New York law, the question of ambiguity vel non must be determined from the face of the agreement, without reference to extrinsic evidence. Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." <u>Collins v. Harrison-Bode</u>, 303 F.3d 429, 433 (2d Cir. 2002) (internal quotation marks and citations omitted). Huber argues that in § 3.7, the parties agreed upon December 31, 1998, as a

---

[9]The grant of summary judgment is reviewed *de novo*. <u>Hugh Symons Group, PLC v. Motorola, Inc.</u>, 292 F.3d 466, 468 (5th Cir. 2002). Summary judgment is proper if the record, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. <u>Id</u>.

"baseline" for comparison; under this view, AVEX's condition as of December 31, 1998, is the baseline condition against which alleged material adverse changes must be assessed.

Benchmark, on the other hand, argues that the contract does not establish December 31, 1998, as a baseline but, instead, specifies the time period (after December 31, 1998) with respect to which Huber warranted the absence of a material adverse change. Under Benchmark's view, the results of operations for the first five months of 1999, which initially showed modest profits followed by substantial losses, are part of the baseline against which alleged material adverse changes must be assessed. We decline to resolve the ambiguity on appeal and, instead, remand for the parties to present extrinsic evidence supporting their interpretations of the agreement. See id. at 434.[10]

In similar fashion, the district court too abruptly dispatched Benchmark's other breach of contract claims by making findings on highly disputed facts. Review of the parties'

---

[10]In addition to the ambiguous contract language, fact issues regarding changes in AVEX's customer relations, a dispute over the impact of arbitrated accounting adjustments, and an email exchange between AVEX's comptroller and CFO preclude summary judgment on this issue. In response to the comptroller's report that preliminary numbers showed a worldwide loss of $1.3 million for July 1999, the CFO told the comptroller not to share this "good news" with anyone until he discussed the numbers with the CEO. The CFO also wrote, "I guarantee we won't report a $1.3 million EBIT loss." While Benchmark argues that the email proves the existence of a material adverse change, Huber argues that preliminary numbers for a single month do not prove a material adverse change, especially if December 31, 1998, is a baseline for comparison since AVEX averaged over $5 million in losses per month in 1998. Huber also argues that the CFO's email could reflect his belief that a $1.3 million loss would not be reported because a loss in that amount did not occur.

arguments convinces us that further factual development on remand is necessary to proper resolution of the contract claims.

**D.    Reassignment on Remand**

Relying solely on the court's unorthodox pretrial procedure, Benchmark asks that this case be reassigned to another district judge in the event of remand.

This circuit employs two tests to determine whether to exercise its extraordinary power to reassign a case to another judge on remand.  In re DaimlerChrysler Corp., 294 F.3d 697, 700 (5th Cir. 2002).  The first test requires consideration of three factors: (1) whether the original judge would reasonably be expected to have substantial difficulty putting aside previously expressed views or findings determined to be erroneous, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.  Id. at 700-01.  The second test permits reassignment "when the facts 'might reasonably cause an objective observer to question [the judge's] impartiality.'"  Id. at 701 (quoting United States v. Microsoft Corp., 56 F.3d 1448, 1463 (D.C. Cir. 1995)).  Reassignment is not warranted under either test.  Although there was substantial delay in the management of the case, and one must question the court's repeated resort to perfunctory or settlement-oriented procedures while thwarting Benchmark's opportunity for

23

discovery, the record does not reflect overt impartiality, bias, or prejudice by the district court.

### III.  CONCLUSION

Based on the foregoing discussion, we conclude that while New York law governs Benchmark's contract claims, Texas law applies to its fraud, statutory fraud and negligent misrepresentation claims.  The fraud and misrepresentation claims should not have been dismissed for inadequate pleading under Rule 9(b).  The Texas fraud claims are viable, however, not based upon precontractual representations, but only insofar as they are based on representations specified in the parties' contract.  The district court erred in peremptorily granting summary judgment against Benchmark's claims except for fraud grounded in precontractual representations.  On remand, we admonish the district court not to cut procedural corners.

The judgment of the district court is accordingly **VACATED** and **REMANDED** for further proceedings consistent with this opinion.