# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 2, 2022

Lyle W. Cayce
Clerk

No. 21-30138

Eric Ottemann, an individual, on behalf of himself and the proposed class,

*Plaintiff—Appellant*,

*versus*

Knights of Columbus, a Connecticut corporation,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-cv-11291

Before Dennis, Southwick, and Wilson, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

An insurance agent contracted with an insurance company to recruit and manage insurance sales agents in Louisiana. After several years, the agent concluded that the company was violating his contract and causing him financial injury. The agent sued for breach of contract and related claims. The district court dismissed the suit for failure to state a claim. We partly disagree and thus REVERSE IN PART and AFFIRM IN PART.

No. 21-30138

## FACTUAL AND PROCEDURAL BACKGROUND

The Knights of Columbus — referred to here as "the Order" or "the KCs" — is a Catholic fraternal society and charitable organization based in Connecticut. The Order offers insurance products to its members. To promote and sell these insurance products, the Order contracts with Field Agents ("FAs") and General Agents ("GAs"). FAs promote and sell insurance products to prospective customers, and GAs recruit and oversee FAs within a specified territory. GAs may also sell insurance products in their territory.

Under the terms of their respective contracts, FAs and GAs are paid commissions on the insurance sales and renewals that they generate. GAs also receive commissions from the sales made by the FAs in their territory. The Order allows FAs to "receive a draw against future . . . commissions in an amount to be determined by the General Agent and the Order." "The right to commissions" for the FA, though, is "subject to offset by the Order of any amounts paid to the Field Agent as a draw against future commissions." In the event that the FA fails to repay the draw, the GAs are liable:

> The General Agent shall also be liable to the Order for any amounts paid to the Field Agent as a draw against future commissions and for any debt of the Field Agent on account of [supplies provided to the Field Agent by the Order and commission adjustments], provided the Field Agent received the draw . . . or incurred the debt while under a contract to the Order to which the General Agent was a party."

The Plaintiff, Eric Ottemann, began selling insurance for the Order in 2006 as an FA. He worked in that capacity until he became a GA in 2013. As a GA, Ottemann was responsible for the territory of "Southeast Louisiana."

2

The relationship between Ottemann and the Order was not always an easy one.  Ottemann alleges miscommunication, mismanagement, and malfeasance on the part of the KCs.  Ottemann alleges that the Order interfered with his contracts by enlisting or terminating FAs without Ottemann's input, enlarging the FAs' draws in contradiction to Ottemann's wishes, and placing limits on which individuals he could solicit within his territory.  Ottemann also contends that this meddling was due to a misalignment in incentives:  The Order's "public ratings as well as the bonuses of [the Order's] senior employees were significantly affected by [the Order's] perceived manpower . . . . Members of [the Order's] upper management told Mr. Ottemann privately that they would receive larger bonuses if the General Agents signed more Field Agents."  More FAs, though, meant a larger draw — and potentially a larger draw debt for Ottemann: "The risk of a Field Agent's failure to pay draw debt was borne exclusively by Mr. Ottemann . . . . [The Order] bore no risk, and it simply paid draw debt from poorly performing Field Agents by paying them from the commissions of General Agents such as Mr. Ottemann."

Ottemann resigned in 2015.  He brought suit against the KCs in 2019 in the United States District Court, Eastern District of Louisiana, alleging among other claims that the KCs breached his contract.  His Third Amended Complaint alleged seven claims, including breach of contract and of the duty of good faith, along with violations of Connecticut and Louisiana wage payment laws.  In the alternative, Ottemann pled several non-contractual theories of recovery.  The district court dismissed each of the claims for failure to state a claim.  Ottemann timely appealed.

## DISCUSSION

This court "review[s] a district court's grant of a motion to dismiss *de novo*." *Boyd v. Driver*, 579 F.3d 513, 515 (5th Cir. 2009) (per curiam).  "To

determine the applicable law, a federal court sitting in diversity applies the choice of law rules of the forum." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003). Because Ottemann brought suit in Louisiana, we apply its choice of law rules. *See id.* Louisiana Civil Code Article 3515 provides the general rule: "Except as otherwise provided . . . an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." La. Civ. Code Ann. art. 3515.

## I.   *Contract claims*

We begin with Ottemann's related breach of contract and breach of the duty of good faith claims. His contracts with the KCs stated that the instruments "shall be governed by and interpreted in accordance with the laws of the State of Connecticut." Article 3540 of the Louisiana Civil Code "generally gives contracting parties the freedom to choose which state's law will govern disputes arising out of the contract." *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 250 (5th Cir. 1994). We conclude that Connecticut law applies to the contractual disputes.

To state a claim for breach of contract under Connecticut law, a plaintiff must show "the formation of an agreement, performance by one party, breach of the agreement by the other party[,] and damages." *Chiulli v. Zola*, 905 A.2d 1236, 1243 (Conn. App. Ct. 2006) (quotation marks and citation omitted). If a contract's language is unambiguous, its interpretation is a matter of law and "the words of the contract must be given their natural and ordinary meaning." *See Cruz v. Visual Perceptions, LLC*, 84 A.3d 828, 834 (Conn. 2014) (quotation marks and citation omitted). "A contract is unambiguous when its language is clear and conveys a definite and precise intent." *Id.* If a contract is ambiguous, though, "the determination of the parties' intent is a question of fact." *Id.* at 833 (quoting *Ramirez v. Health*

*Net of the N.E., Inc.*, 938 A.2d 576, 586 (Conn. 2008)).  "[A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *Id.* at 834 (quoting *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 791 A.2d 546, 550 (Conn. 2002)).

To constitute a claim for breach of the implied covenant of good faith and fair dealing under Connecticut law, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 67 A.3d 961, 986 (Conn. 2013).  Lower Connecticut courts have identified three elements in this analysis: (1) "the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits;" (2) "the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits;" (3) "the defendant was acting in bad faith" when engaging in that conduct. *See, e.g.*, *American Int'l Specialty Lines Co. v. HMT Inspections*, No. 2010-cv-95007419-s, 2011 WL 1759098, at *5 (Conn. Super. Ct. Apr. 13, 2011).

In his complaint, Ottemann claimed breaches of Sections 4, 7, 8, and 13 of his GA Contract; Sections 2 and 6 of the agreements he signed with FAs in his capacity as a GA; and unspecified provisions of his FA contract.  He also claimed that the same actions breached the covenant of good faith and fair dealing.  The district court found that, "[u]pon review of these alleged breaches, the amended complaint fails to identify an action that violates the terms of either contract."  Further, the court held that "the practices complained of . . . are set forth clearly within the GA Agreement."[1]  In our

---

[1] As a preliminary matter, the district court seems to have considered only two contracts.  The district court's order stated: "there are two contracts at issue: [t]he [2013] General Agent Agreement . . . and the [earlier] Field Agent Agreement."  The district

review, though, we find ambiguity in certain clauses. We consider the alleged breaches first of Ottemann's GA contract, then of the FA contracts to which Ottemann was a party, and, finally, of Ottemann's original FA contract.

### a. *Ottemann's GA contract*

Ottemann alleges that the Order breached Sections 4, 7, 8, and 13 of his GA contract.

Section 4 of the GA contract provides that "the General Agent shall be free to exercise independent judgment as to the eligible persons from whom applications for insurance will be solicited, and as to the time and place of such solicitation." It also states: "The General Agent shall abide by rules and procedures established by the Order, but such rules and procedures shall not be construed as interfering with the freedom of action of the General Agent as described in this agreement."

Ottemann argues that the Order breached this provision when it prevented him from soliciting certain members in his region. Ottemann's complaint states that the Order directed Ottemann to refrain from soliciting NFL coach Joe Lombardi, who lived in Ottemann's territory, because the Order sought to solicit him under their NFL-specific program.

The parties differ in their understanding of this conduct. Ottemann's interpretation of this provision, as alleged in his complaint, is that "[S]ection[] 4 of the [GA] Agreement . . . stated that Plaintiff was an independent contractor that was 'free to exercise independent judgment as to eligible persons from who applications for insurance will be solicited' and

---

court does not seem to have contemplated the various FA contracts to which Ottemann and the Order were parties but which primarily concerned Ottemann's FAs. Ottemann did not include these separate contracts with his pleadings, and his complaint merely suggested that the FA agreements he signed in his capacity as a GA were substantially the same as the one he signed in 2013.

have 'freedom of action.'"   The Order responds that the GA contract explicitly stated that Ottemann had no "authority to bind the Order to issue any insurance policy," and that it was no breach to tell Ottemann not "to waste his (and the Order's) time and resources soliciting that person."  The Order also argues there would be no damages to sustain a claim because, even if Ottemann was allowed to solicit Lombardi, the Order contractually reserved rights to refuse the issuance of policies.

We hold that Ottemann's claim as to Section 4 is plausible at the motion to dismiss stage.  Although there is nothing particularly surprising about the Order's interest in diverting high-value prospects into a special sales program, the contract states that the rules and procedures set up by the Order "shall not be construed as interfering with the freedom of action of the General Agent."  The contract does not demarcate the boundary between Ottemann's freedom of action as a GA and the scope of the Order's ability to dictate "rules and procedures" that would divert otherwise available insurance prospects from his territory.  We hold that Ottemann's claim based on breach of Section 4 of the GA contract survives the motion to dismiss stage.  Because Ottemann plausibly alleges that this diversion was done with bad faith, his claim for breach of the duty of good faith and fair dealing regarding Section 4 of the GA contract also survives the motion to dismiss stage.

The remainder of Ottemann's theories of breach of the GA contract were properly dismissed.  Section 6 of the GA contract states that commissions will be paid according to a schedule incorporated in the contract.  Section 7(c) states that "[t]he right to commissions . . . shall also be subject to payment of the General Agent's indebtedness to the Order," stating a non-exclusive list of items included in the calculation of that indebtedness.

No. 21-30138

In his complaint, Ottemann alleges that the Order impermissibly withheld commissions under Section 7 by failing to make appropriate reimbursements and illegitimately increasing the FA draw debt.[2] Specifically, Ottemann alleges that he was never reimbursed for "costs for leasing an office, using computer equipment, supplies, insurance, software, postage, and continuing education, among others." Ottemann also claims that the Order "withheld, diverted, deducted, or purportedly offset Mr. Ottemann's earned renewal commissions by the amount of Field Agents' draw debt."

These may be understandable grievances, but they do not constitute additional breaches of contract. For example, the Order was not obligated under the GA contract to reimburse Ottemann for "costs for leasing an office, using computer equipment, supplies, insurance, software, postage, and continuing education." On the contrary, Section 5(d) of the GA contract specifically stated that "[t]he General Agent and his Field and District Agents shall not incur any expense on behalf of the Order," and Section 7(c) specifically allows for deductions for "supplies provided to the General Agent or his Field and District Agents by the Order." If anything, the GA contract makes Ottemann liable to the Order for such expenses, not the other way around.

---

[2] In his third amended complaint, Ottemann also alleges that the Order renegotiated contracts after his termination so that he would no longer earn commissions. The only portion of the appellate briefing that could potentially relate to this claim merely states that a Knights of Columbus Vice President once said, "[w]e have ways to make [a General Agent] stay away by cutting off his [insurance policy] renewals and commissions," and that the Order "engaged in the same course of conduct in relation to [Ottemann's] omissions." Such limited discussion is insufficient to sustain the argument on appeal. *See United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010) (holding that an appellant waives a claim on appeal by failing to brief it adequately).

No. 21-30138

Further, Ottemann has not alleged an additional breach in his claim that the Order "withheld, diverted, deducted, or purportedly offset [his] earned renewal commissions by the amount of Field Agents' draw debt." It is not a breach of the contract to hold Ottemann liable for legitimate Field Agent draw debt: Section 6(b) expressly provides that commissions are "subject to offset . . . of any amounts paid to the General Agent, or to the General Agent's Field Agents, as a draw against future commissions." Further, even if the Order interfered with Ottemann's freedom of action as a GA in preventing his termination of FAs, the appropriate measure of damages would necessarily contemplate compensation for withheld commissions due to illegitimate draw debt.

Ottemann's alleged breaches of Section 8 and 13 of his GA contract also fail. Section 8 of the GA contract provides for the vesting and payment of renewal commissions for GAs. Section 13 concerns the return of "property of the Order" upon termination. Because Ottemann has not addressed on appeal how the Order breached these provisions, he has forfeited these arguments. *See Scroggins*, 599 F.3d at 447 (holding an appellant waives a claim on appeal by failing to adequately brief it).

Summarizing Ottemann's claims about his GA contract, we hold that Ottemann has stated a plausible claim that the Order breached Section 4 of his GA contract. The district court did not err, though, in dismissing Ottemann's claims under Sections 7, 8, and 13 of the GA contract.

### b. *FA contracts to which Ottemann was a party*

Ottemann also alleges that the Order breached "Sections 2 and 6 of the Field Agent Agreements signed by [Ottemann]" in his capacity as a GA.

Ottemann does not specify how the Order breached Section 2 of the FA contract, which allows the GA to "change or revoke the assignment of councils [assigned to an FA] in accordance with guidelines established by the

Order." Ottemann might be arguing that this provision allowed him to terminate FAs at will as a GA. This would necessarily involve "changing or revoking the assignment of councils" in the process. Such an interpretation would exceed the scope of authority delegated to him by the contract. Because Ottemann did not specifically allege that he sought to change the council assignments for his FAs and was stymied in this pursuit by the Order, we hold that he has not alleged a plausible breach pertaining to Section 2 of the FA contracts.

Ottemann makes more concrete allegations pertaining to a breach of Section 6 of the FA contracts. Section 6(c) sets out the guidelines regarding an FA's draw. It states that the FA may receive a draw "in an amount to be determined by the General Agent and the Order." In his complaint, Ottemann alleges that the Order breached the "Field Agent Agreements where Plaintiff was a party" by not allowing Ottemann to "set[] the amount of [his] Field Agents' draws."

Specifically, Ottemann alleges that he had no input into the amount of the draws. In his complaint, Ottemann alleges that "Defendant became the sole decisionmaker regarding hiring and terminating Field Agents and setting the amount of their draws." The contract is ambiguous as to the balance of the power sharing between the Order and Ottemann. If one reads the contract to mean that both the GA and the Order must agree to the amount of an FA draw, but the Order in fact was "the sole decisionmaker," Ottemann has alleged a plausible breach. If, instead, the Order were permitted to override Ottemann's input, there would be no breach of contract. The text of the contract does not clearly demarcate the division of power envisioned by the parties, and resolving this dispute precipitates a question of fact which cannot be resolved as a matter of law on a motion to dismiss. Because Ottemann plausibly alleges that the Order increased his staff for its own benefit in bad faith, his claim for breach of the duty of good

faith and fair dealing regarding Section 6 of the FA contracts also survives the motion to dismiss stage.

### c. *Ottemann's FA original contract*

Ottemann's remaining breach of contract allegations concern provisions of his FA Contract.   Ottemann alleges that the Order impermissibly deducted debt accrued by the FAs under his management as a GA from recurring commissions he was due from his time as an FA.

Ottemann's complaint does not identify any particular provision of the FA contract that the Order allegedly violated. His briefing discusses Section 7(c) of the FA contract, which allowed deductions to his own FA commissions on account of "the Field Agent's indebtedness to the [O]rder." From there, Ottemann argues that this creates liability only for debts incurred in his capacity as an FA.  He contends this is so based on the FA agreement's statement that the commission reduction was subject to "payment of the Field Agent's indebtedness to the Order, including but not limited to" a number of FA-specific expenses and obligations.

The Order reads the Section 7(c) deduction allowance more broadly. According to the Order, because "Field Agent" is a defined term that refers at all times in that contract to Eric Ottemann, "the Field Agent's indebtedness to the Order" extends beyond any indebtedness that Ottemann might incur in his capacity as an FA and extends to any indebtedness he might have incurred at any future point.  The Order argues this provision permits it to deduct debts that Ottemann became responsible for in his capacity as a GA against compensation he was due under his old (but never novated or cancelled) FA agreement.

We hold that the contract is ambiguous as to the scope of the FA's indebtedness to the Order under Section 7(c) of the FA contract.  It may be entirely reasonable that the Order would expect any future debts under

subsequent contracts to count against Ottemann's earnings under the original FA contract. On the other hand, given that the FA contract has no provision governing elevation to a GA position, nor does it refer to any future contractual relationships, it is ambiguous as to whether "the Field Agent's indebtedness to the Order" contemplates indebtedness incurred under other contracts as well as indebtedness incurred under the original FA contract. Accordingly, Ottemann's breach of contract claim as it relates to Section 7(c) of his FA contract survives the motion to dismiss stage.

## II. *Equitable claims*

Ottemann's complaint also alleges claims for unjust enrichment and quantum meruit.[3] Once again we apply Connecticut law to evaluate these claims that sound in contract. *See* La. Civ. Code Ann. art. 3540.

The Connecticut Supreme Court's guidance is sufficiently clear: Claims for unjust enrichment or quantum meruit may stand "[w]herever justice requires compensation . . . for property or services rendered under a contract, and no remedy is available by an action on the contract." *Town of New Hartford v. Conn. Res. Recovery Auth.*, 970 A.2d 592, 609 (Conn. 2009) (quoting 26 Williston on Contracts, § 68:4 (4th ed. 2003)). In such cases, "restitution of the value of what has been given must be allowed." *Id.* At the same time, "an employee [may] not recover in unjust enrichment . . . when there exist[s] an express, enforceable employment contract that set[s] the terms of the employee's salary but [does] not provide for [incentive compensation sought], and the employee [does] not . . . perform[] services

---

[3] Although Ottemann asserts unconscionability as a separate issue on appeal, his complaint does not allege a separate unconscionability claim. In any case, we cannot say that the GA contract meets the high bar for unconscionability set by the Connecticut Supreme Court. *See Smith v. Mitsubishi Motors Credit of Am.*, 721 A.2d 1187, 1190–93 (Conn. 1998) (outlining the exacting standards for a finding of either procedural or substantive unconscionability).

not contemplated by that contract." *Id.* at 611. Only "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Id.* at 612 (quoting *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 786 (8th Cir. 1996)). Because commissions — the subject matter for which Ottemann seeks recovery — are provided for in the contract, his remedies are limited to that provided for by the contract. No separate equitable claim is viable.

### III.   *Wage payment statute claims*

Ottemann also brought claims under both the Connecticut wage law and the Louisiana Wage Payment Statutes. The district court dismissed Ottemann's claim under Connecticut wage law because it found that Ottemann was "not an employee under Connecticut's wage law." The court relied on a Connecticut trial court decision to state that non-Connecticut workers are "not afforded the protection of the Connecticut [wage payment] statute." *Kubas v. Hartford Fin. Servs. Co.*, 27 Conn. L. Rptr. 565, 2000 WL 1170237, at *2 (Conn. Super. Ct., July 19, 2000).

We make no holding as to whether Ottemann is covered under Connecticut's wage law. Rather, as both the Louisiana and Connecticut statutes purport to protect employee wages after discharge, we conclude that the district court should have addressed the antecedent question of which wage statute applies under Book IV of the Louisiana Civil Code, "Conflict of Laws." *See* LA. CIV. CODE ANN. art. 3515. This analysis was not performed by the district court.

The district court also dismissed Ottemann's Louisiana wage payment claim. Its findings regarding the Louisiana wage payment claim, though, rested on the propriety of the Order's deductions: "Plaintiff's commissions were always subject to offset in accordance with the express

terms of the General Agent Agreement, and thus in accordance with the terms of employment."

Because we have held that Ottemann has stated plausible breach of contract claims that survive a motion to dismiss, the district court will also need to conduct a more extensive analysis of Ottemann's Louisiana wage payment claim on remand if it finds that the Louisiana Wage Payment Statutes apply after conducting a choice of law analysis.

***

We REVERSE the district court's holding that Ottemann has failed to state a claim upon relief which can be granted regarding a breach of contract in relation to Section 4 of the GA contract, Section 6 of the FA contracts to which he was a party, and Section 7(c) of Ottemann's original FA contract. We REVERSE the district court's holding that Ottemann has failed to state a claim for the breach of the duty of good faith and fair dealing in relation to performance of Section 4 of the GA contract and Section 6 of the FA contracts. We also REVERSE the district court's holdings that Ottemann has failed to state a claim under both the Connecticut and Louisiana wage payment laws, and REMAND for further consideration. We AFFIRM the remainder of the district court's judgment, including the dismissal of Ottemann's equitable claims.