# United States Court of Appeals
## For the First Circuit

No. 08-1403

NORTH AMERICAN CATHOLIC EDUCATIONAL
PROGRAMMING FOUNDATION, INC.,

Plaintiff, Appellant,

v.

GERRY CARDINALE, ROB GHEEWALLA, JACK DALY;
GOLDMAN SACHS GROUP, INC.; GS CAPITAL PARTNERS III, L.P.;
GS CAPITAL PARTNERS III OFFSHORE, L.P.;
GOLDMAN SACHS & CO. VERWALTUNGS GmbH,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before
Boudin, Siler,* and Howard,
Circuit Judges.

Matthew T. Oliverio with whom Christine M. Curley and Oliverio
& Marcaccio LLP were on brief for appellant.
Douglas H. Flaum with whom Shahzeb Lari, Fried, Frank, Harris,
Shriver & Jacobson LLP, Wayne F. Dennison, Brian J. Lamoureux and
Brown Rudnick LLP were on brief for appellees.

May 19, 2009

---

*Of the Sixth Circuit, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.  North American Catholic Educational Programming Foundation, Inc. ("North American") appeals from the district court's judgment; the judgment dismissed its lawsuit--the fourth stemming from its failed business relationship with Clearwire Holdings, Inc. ("Clearwire")--for lack of personal jurisdiction.  North American is a nonprofit organization, incorporated and having its principal place of business in Rhode Island, whose mission is to provide educational and religious programming.

We take the facts primarily from the complaint. Clearwire was formed in the 1990s as a for-profit company aiming to develop a national wireless data network providing internet access. It was principally financed by the investment bank Goldman Sachs, which initially controlled most of its voting stock.  Clearwire in turn controlled a number of other entities that were expected to manage and operate the wireless data network that Clearwire aimed to develop starting in or around the year 2000.

At that time, the cellular telephone network could not handle the data transmitted by internet users.  For this purpose, carriers like Sprint and WorldCom were seeking to use spectrum, thought to be especially suitable, already allocated for use in the Instruction Television Fixed Service ("ITFS"); licenses for ITFS spectrum were held predominantly by educational entities, including North American.  In March 2000, North American joined with two

-2-

other holders of ITFS spectrum licenses to form the ITFS Spectrum Development Alliance ("the Alliance") to develop this opportunity.

As existing short term leases already granted by Alliance members to third parties expired, the Alliance members proposed to license their spectrum for use in a wireless data network; but they also aimed to own an equity interest in the new network. The Alliance began negotiations with Goldman Sachs, represented by Gerry Cardinale and Rob Gheewalla, later joined by Jack Daly. All three men were employed by affiliates of Goldman Sachs & Co., reside in New York and later served as directors of Clearwire.

On June 7, 2000, Cardinale sent a memorandum, addressed to the Alliance and the heads of its three members, on behalf of what he termed the "Goldman Sachs Team," setting out a proposal to use Alliance spectrum, allow the Alliance to retain an equity interest in the network and provide an up-front cash payment. Later in the year, Goldman's affiliate GS Capital Partners III sent a term sheet to the Alliance members outlining the terms of an agreement in principle, and a master agreement was signed by the Alliance members and Clearwire in March 2001.

Under the master agreement, Alliance members would, as their existing leases expired, lease their spectrum to Clearwire and the Goldman Sachs entities agreed to invest $47 million in Clearwire. In addition, Cardinale, Daly and Gheewalla were appointed to Clearwire's board where, under the agreement, Goldman

Sachs representatives could cast a tie-breaking vote.  The Alliance members obtained in turn an initial small stake in Clearwire.

In June 2002, WorldCom collapsed, which threatened to free up a large amount of WorldCom-owned spectrum.  Soon after, Clearwire began to negotiate with members of the Alliance, seeking to be relieved of its obligations to use Alliance spectrum.  The negotiations initially proved fruitless, and on September 11, 2002, Clearwire's board passed a resolution saying that it would breach the master agreement by failing to make promised payments to Alliance members.

On February 12, 2003, Clearwire's board discussed a reorganization plan which, North American alleges, would have eradicated Alliance members' claims against Clearwire.  The other two Alliance partners then settled their claims against Clearwire in exchange for reduced payments.  North American says that during this time, Daly, apparently acting on behalf of Clearwire, met with North American's President to discuss a possible settlement, but that North American refused.

All the while, Clearwire's financial position was growing more perilous as it spent money developing its network but lacked any meaningful source of revenue.  In May 2003, Clearwire told its shareholders that it was running out of capital and, during the summer, it made an offer of preferred stock to its shareholders to obtain "bridge" financing, saying that it was negotiating either

for more financing or a sale of the company.  North American did not acquire more stock.  In November 2003, Clearwire effectively sold itself to another company, headed by noted telecom investor Craig McCaw, on terms benefitting those shareholders who had bought additional preferred stock to supply bridge financing.

Since that time, North American has brought a succession of law suits against the various parties involved in its relationship with Clearwire.  First, North American sued Clearwire itself in Delaware Superior Court, claiming breaches of the master agreement, but North American withdrew the action early in 2004. N. Am. Catholic Educ. Programming Found., Inc., v. Clearwire Holdings, Inc., C.A. No. 03C-11-172 (RRC) (Del. Super. Ct.).

Then, North American brought another suit in Delaware Superior Court against Cardinale, Gheewalla and Daly, asserting various counts of fraud and breach of fiduciary duty; after being withdrawn and then re-filed in Delaware Chancery Court, the complaint was dismissed, the fiduciary duty claim on substantive grounds and the others for lack of personal jurisdiction; and the dismissal was affirmed on appeal.  N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92 (Del. 2007).

Finally, on November 15, 2006, North American filed the present action in the federal district court in Rhode Island, again asserting wrongful conduct related to the master agreement and the bridge financing.  The individual defendants were again Cardinale,

Gheewalla and Daly; also named as defendants were Goldman Sachs Group, Inc. ("GS Group"), a Delaware corporation with its principal place of business in New York, and various affiliated entities.[1]

Defendants moved to dismiss the suit under Rule 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(5) on statute of limitations grounds and under Rule 12(b)(6) for failure to state a claim. The district court dismissed the case on the first ground and North American has now appealed. The appellees defend the district court judgment but urge, in the alternative, other defects with the suit including failure to state a claim. The issues raised on appeal are primarily questions of law which we review de novo.

The central basis urged by North American for personal jurisdiction rests, as explained more fully below, upon specific rather than general jurisdiction. Thus, to affirm on the ground adopted by the district court, we would have to determine separately potential jurisdiction not only as to each defendant but also separately for each such entity under each count of the complaint. Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999).

---

[1]GS Capital Partners III, L.P. ("GS Capital Partners"), registered in Delaware, and GS Capital Partners III Offshore, L.P. ("GS Offshore"), which has its home in the Cayman Islands, are affiliates of GS Group; as is defendant Goldman Sachs & Co. Verwaltungs GmbH ("GS Verwaltungs"), registered in Germany.

However, "where an appeal presents a difficult jurisdictional issue, yet the substantive merits underlying the issue are facilely resolved in favor of the party challenging jurisdiction, the jurisdictional inquiry may be avoided." Kotler v. Am. Tobacco Co., 926 F.2d 1217, 1221 (1st Cir.1990), vacated on other grounds, 505 U.S. 1215 (1992). Here, we first sweep away the hopeless claims and then focus on personal jurisdiction only as to what remains. So examined, the complaint is fatally insufficient save as to one pair of related allegations that form only part of the final four counts.

The sufficiency of the claims stated is properly before us. The defendants' brief in this court argued that the dismissal should, in the alternative, be upheld under Rule 12(b)(6). North American has declined to respond to this alternative argument in its reply brief, saying that the district court did not resolve the issue under Rule 12(b)(6); instead, North American refers us to its opposition to the Rule 12(b)(6) motion below and asks to file a further brief if we propose to address the issue.

An appellee may defend "the judgment" below on any valid ground, McGuire v. Reilly, 260 F.3d 36, 50 (1st Cir. 2001), cert. denied, 544 U.S. 974 (2005), so it does not matter that the district court did not need to decide the Rule 12(b)(6) objection. Nor is a cross reference to a brief filed below an adequate response and forfeiture by North American could be urged. Mass.

-7-

Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).  Yet, North American's district court opposition is readily available, and we address its position on the merits.[2]

North American might have argued (but has not) that the Rule 12(b)(6) objection, if sustained, is not exactly an alternative ground because a dismissal for lack of personal jurisdiction is ordinarily without prejudice.  But no practical difference may be present here: if the personal jurisdiction dismissal were upheld, the statute of limitations would arguably preclude a new filing in New York--seemingly the sole venue where personal jurisdiction could readily be secured over defendants.

Turning then to count I, it purportedly asserts a claim for fraudulent inducement, allowable under Rhode Island law, Guzman v. Jan-Pro Cleaning Sys., Inc., 839 A.2d 504, 507 (R.I. 2003), but it fails on its face to meet the requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Rule 9(b)'s heightened pleading standard applies to state law fraud claims asserted in federal court.  Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 427 (1st Cir. 2007).

---

[2]North American's contingent request to file a supplemental brief comes too late; and, in any event, North American had ample incentive to put forth in the district court its best opposition to the Rule 12(b)(6) motion.

Rule 9(b) requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter. Although the rule itself is not pellucid, precedent in this circuit, as in a number of others, is clear:

> The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading.

Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992) (Breyer, J.) (citations omitted), superseded by statute on other grounds, Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737; see also Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991), similarly superceded by statute on other grounds.

North American provides no information in the complaint to suggest that the defendants feigned their original expressed intention to use the Alliance's spectrum. The complaint says that Goldman Sachs never intended to follow its business plan but the assertion is not itself supported with particulars that suggest scienter and so just pushes the pleading deficiency back one stage; no particulars are pleaded which would suggest the elements of fraud in the inducement.

Count II is also a fraud claim, and so also subject to Rule 9(b)'s particularity requirement, but is a jumble of different claims: the count says that the defendants fraudulently induced North American "to continue" its business; that they misused Clearwire assets; and that they engaged in self dealing. Nothing in the count remotely describes facts from which an inference of fraudulent intent may be drawn. A search of the rest of the complaint, cross referenced generally by the count, similarly fails to fill the deficiency.

Counts III and IV of the complaint allege that the defendants tortiously interfered with prospective business opportunities of North American. Rhode Island law recognizes a roughly similar tort, Mesolella v. Providence, 508 A.2d 661, 669 & n.9 (R.I. 1986), and arguably Rule 9(b) does not apply except so far as fraud is specifically alleged as an ingredient of the claim. But each of the elements of the claim still has to be adequately alleged. Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996). They are:

> (1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff.

Mesolella, 508 A.2d at 669-70.

Count III claims that Clearwire asserted rights to use North American's spectrum during a period when it could have been

offered by North American to others and so interfered with North American's prospective business opportunities. Even assuming that Clearwire's assertion of rights was unjustified, there are no facts asserted--or even specific allegations--to show that defendants were aware of North American's desire at that time to dispose of the rights to third parties or possessed the scienter needed to establish intentionality under Mesolella.

Count IV is also framed as an interference count but explicitly asserts "fraudulent conduct and misrepresentations." It says that the defendants falsely represented to North American's two Alliance partners that Clearwire faced imminent bankruptcy, thereby "fragmenting the Alliance" by forcing the other two members to settle. The count alleges that this reduced the Alliance's leverage in the market and interfered with North American's ability to acquire additional spectrum in the market, which it was "ready, willing and able" to do.

This looks primarily like a claim suitable, if at all, to the other two members. In all events, given that fraudulent misrepresentation is the lynchpin, this claim too triggers Rule 9(b). Rodi v. S. New. Eng. Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004). No basis is suggested for believing that if made, the predictions of imminent collapse were knowingly false when made. Nor is it alleged that the defendants were aware of any effort or of any desire by North American to acquire additional spectrum.

-11-

North American says that Rhode Island "does not require proof of a prospective business opportunity at the pleading stage of a tortious interference claim . . . ." But federal law governs the specificity requirements for pleadings in federal courts even in diversity actions. Universal Commc'n Sys., Inc., 478 F.3d at 427. The defects in this instance are not ones of proof but of pleading facts that, if true, would satisfy the specific elements of a claim as defined by state law. Thus count IV also fails.

The remaining counts--V through VIII--appear to focus upon Clearwire's offer in 2003 to let existing shareholders acquire preferred shares in aid of bridge financing. North American did not take up the opportunity, and it says (so far as we can tell) that this was because defendants failed to reveal that Clearwire was well along in negotiating a sale of assets to McCaw. Further, it is suggested that some defendants or those connected to them did acquire such shares.

We say "appear" and "so far as we can tell" because several of the last four counts are vague and each purports to incorporate all prior 58 paragraphs of description. However, each count concerns the bridge financing, and the use of four counts reflects the different legal theories offered to create liability based on the underlying events: breach of a fiduciary duty of

loyalty and care (count V) and of disclosure (VI), unjust enrichment (VII) and fraud and misrepresentation (VIII).[3]

Rule 9(b) pertains to most--possibly all--of these allegations. Rule 9(b) applies most clearly to the claim of fraud in count VIII and its use in count VII so far as the tort underpinning the claim is fraud; one might think that negligent misrepresentation and fiduciary duty were not on their face subject to Rule 9(b), but the case law here and in other circuits reads Rule 9(b) expansively to cover associated claims where the core allegations effectively charge fraud.[4]

The ascertainable core of the four counts, we think, is the prospect of a sale to the McCaw group. The complaint itself alleges that by spring 2003 Clearwire was hemorrhaging cash and trying hard to raise new funds. So, if Clearwire were on the edge of completing a deal with McCaw, then one might argue that there was a duty to disclose or--perhaps more plausibly--at least a duty of management insiders not to increase their own stake in Clearwire based on knowledge not shared with other stockholders.

---

[3]We do not separately discuss unjust enrichment since an element of such a claim, at least in the present context, would be some wrong that makes the enrichment culpable, Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 936 (3d Cir. 1999), cert. denied, 528 U.S. 1105 (2000); and only fraud or breach of fiduciary duty are offered to fill that role.

[4]Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985); Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 723 (5th Cir.), modified, 355 F.3d 356 (5th Cir. 2003); Frota v. Prudential-Bache Sec., Inc., 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986).

The latter claim--effectively one of dilution--is more plausible because both case law and common sense cabin a company's obligation to disclose ongoing negotiations that have not yet led to an agreement and might easily fail.  Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 847 (Del. 1987) (citing cases).  Apart from the risks of prejudicing negotiations, disclosure could itself be the basis for securities-law claims by stock purchasers if the trumpeted negotiations eventually failed; some cases even purport to establish per se rules against such disclosure claims based merely on negotiations.[5]

North American does not allege that in August 2003 Clearwire had reached an agreement with McCaw, and it appears that no such agreement was reached until November.  So there is no obvious inference that in August a deal with McCaw was on the edge of completion.  Further, the August 20 letter offering rights in preferred shares did disclose that Clearwire was in discussion with unnamed others about the possible sale of the company or its assets, and the letter offered to supply more information on request.

Admittedly, North American may not know even how far discussions with McCaw had gone; and the defendants' brief sheds no

---

[5]See, e.g., Flamm v. Eberstadt, 814 F.2d 1169, 1174-75 (7th Cir.), cert. denied, 484 U.S. 853 (1987); Reiss v. Pan Am. World Airways, Inc., 711 F.2d 11, 14 (2d Cir. 1983).  Yet there is some precedent, perhaps outdated, that looks more favorably upon such claims.  Holmes v. Bateson, 583 F.2d 542 (1st Cir. 1978).

light on the matter.  But Rule 9(b) is intended to set a higher than normal threshold of specificity in factual allegations before the discovery machinery can be set in motion.  E.g., Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (citing McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228-29 & n.2 (1st Cir. 1980), superseded by statute on other grounds, Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737).  North American does allege that some of those connected with Clearwire purchased preferred shares; but it would be tricky to infer that they knew of an imminent deal, since the McCaw purchase occurred several months later.

However, for two reasons we are unwilling to assume that no amendment could rescue certain of the claims based on the bridge financing.  For one thing, counts I-IV, apart from their formal deficiencies, are implausible; by contrast, the possibility that facts were wrongly withheld as to the bridge financing is more specific and gains a bit of color from the related charge of insider purchases.  For deficiencies under Rule 9(b), leave to amend is often given, at least for plausible claims.  E.g., New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286, 292 (1st Cir. 1987).

The other consideration is that the lack of disclosure claim seems to be twinned with a theory that depends less on failure to disclose than on improper dilution based on management

-15-

use of inside information.  How far this could be supported by fiduciary duty concepts--explicitly invoked by plaintiffs--is uncertain; nor is it clear how far Rule 9(b) would apply to such a claim.  Neither issue has been seriously briefed by either side.  Thus, while we think that more must be shown by North American, we are not certain that two narrowed versions of counts V-VIII are wholly beyond rescue.

This takes us to the question of whether either version could come within the district court's personal jurisdiction.  Such jurisdiction, if it exists in this case, rests not on the presence of the defendants in Rhode Island--the classic basis for general jurisdiction--but on the "reasonableness" jurisprudence stemming from International Shoe Co. v. Washington, 326 U.S. 310 (1945).[6] Rhode Island's long arm statute is designed to extend jurisdiction to the full constitutional reach.  Donatelli v. Nat'l Hockey League, 893 F.2d 459, 461 (1st Cir. 1990).

In a nutshell, personal jurisdiction under International Shoe, allowing jurisdiction to be asserted as to a specific claim, can be established where the defendants availed themselves of the

---

[6]North American does argue that jurisdiction may be exercised over GS Group under a theory of general jurisdiction because it has designated an agent of process in Rhode Island. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984). But, courts have consistently held that the appointment of an agent of process alone does not suffice to allow for the exercise of general jurisdiction. See, e.g., Wenche Siemer v. Learjet Acquisition Corp., 966 F.2d 179, 182 (5th Cir. 1992).

opportunity to do business in the state, the claim in question is related to that access and the so-called gestalt factors are consistent with requiring an out-of-state defendant to defend within the state.[7]   Here, the argument for relatedness and availment is that the bridge financing offer, and attendant information, were directed in part to North American by information sent to it in Rhode Island.

The extent of Clearwire communications to Rhode Island are not certain, but (allegedly) North American was a holder of shares, received information sent by Clearwire to North American in Rhode Island describing Clearwire's financial travails, and received two offers from Clearwire in Rhode Island--the latter supplanting the former--to participate in bridge financing.  If North American was wrongfully duped into inaction, it was duped in Rhode Island by materials directed to it in Rhode Island.

How far individual defendants could be held responsible for Clearwire's actions is a different question, but the complaint effectively charges that the defendants were in control of Clearwire during the period in question.  Responsibility for another's actions is not a matter as to which particularity in pleading is required, Miss. Public Employees' Retirement Sys. v.

---

[7]E.g., Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008), cert. denied, 129 S. Ct. 999 (2009); Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007); Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005);  James, Hazard & Leubsdorf, Civil Procedure § 2.6 (5th ed. 2001).

<u>Boston Sci. Corp.</u>, 523 F.3d 75, 93 (1st Cir. 2008), and North American has had no discovery as to the precise connections between the defendants and Clearwire.

The case law is less than definitive where, as here, defendants out of state engage in transactions with in-state residents, and some outcomes may depend on exact circumstances; but several of our decisions uphold personal jurisdiction when an offer is specifically directed from outside of the state to a resident within it, the information conveyed is culpably false or incomplete, and the offeree suffers damage as a result of the conduct by its action or inaction within the state.

Thus, in <u>Murphy</u> v. <u>Erwin-Wasey, Inc.</u>, 460 F.2d 661, 664 (1st Cir. 1972), we said: "Where a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state." Another example is <u>The Ealing Corp.</u> v. <u>Harrods Ltd.</u>, 790 F.2d 978, 983 (1st Cir. 1986) (sending a single fraudulent misrepresentation into a state supports personal jurisdiction in the receiving state). The Restatement suggests a similar outcome. <u>See Restatement (Second) of Conflict of Laws</u> § 148 & cmt. j (1971).

Even so, jurisdiction would still require a decision by the district court that it satisfied the gestalt factors. <u>E.g.</u>, <u>Adelson</u>, 510 F.3d at 49. But such an outcome is not patently

implausible, at least as to the claim of inadequate disclosure; it might be a close question as to a breach of fiduciary duty leading to dilution but not directly connected with anything done in Rhode Island. Again the issue has not been adequately briefed.

Of course, the fraud version of the claim will depend on the willingness of the district court to allow an amended pleading to comply with Rule 9(b) and, probably more relevant, the ability of the plaintiff to supply additional facts to satisfy the rule. Rule 9(b) might or might not apply to the dilution version of the claim based on fiduciary duty but it is not clear that this version of the claim would support personal jurisdiction.

Whereas the fraud version rests on supposedly inadequate communications sent to North American in Rhode Island, the dilution version depends on what the defendants did outside of Rhode Island. "A breach of fiduciary duty occurs where the fiduciary acts disloyally." Exeter Acad., 196 F.3d at 291. But the district court did not address the adequacy of the dilution claim nor did it directly consider personal jurisdiction as to such a claim or the possibility of pendant jurisdiction if the fraud version survived.

The fraud and dilution versions are closely related; and the open issues--especially adequacy as to the former and personal jurisdiction as to the latter--are not straightforward. So as to this pair of embedded claims, we will vacate the district court's dismissal and remand for further proceedings. The first four

counts in their entirety and the final four (save as they embody the two claims whose dismissal we vacate) need not be considered further.

There is one loose end. Assuming _arguendo_ that on remand North American can state a claim against, and also establish personal jurisdiction with respect to, a defendant responsible for sending fraudulent material into Rhode Island, or responsible for dilution of North American's ownership interest in violation of fiduciary duty, it is unclear whether jurisdiction would be satisfied as to _other_ defendants. Conceivably, arguments for jurisdiction could be based on agency or joint venture theories,[8] but the issues have not been briefed.

On remand the district court may find it easier to proceed by focusing on the most vulnerable defendant as to each of the two claims. If no claim is stated or personal jurisdiction is lacking against that defendant, then any question of reaching the other defendants will hardly matter; if the contrary proves true, further briefing and even jurisdictional discovery may be required to decide if other defendants can be reached; but how to proceed on remand is for the district court to decide.

---

[8]_See_ _Burger King Corp._ v. _Rudzewicz_, 471 U.S. 462, 480 n.22 (1985); _Daynard_ v. _Ness, Motley, Loadholt, Richardson & Poole, P.A._, 290 F.3d 42, 55 n.8 (1st Cir.) (citing cases), _cert. denied sub nom._, _Scruggs_ v. _Daynard_, 537 U.S. 1029 (2002).

-20-

We have made clear our doubts whether this case is likely to go beyond the pleading stage: most of the supposed claims fail at the outset; the fraud claim based on bridge financing faces the Rule 9(b) hurdle; the dilution claim, even if it can be resuscitated by amendment, may be beyond the court's personal jurisdiction. But indulging the plaintiff's allegations as the law requires at this stage, e.g., <u>Prairie Eye Ctr.</u>, 530 F.3d at 26, these two versions do require further consideration on remand within the framework set forth above.

The dismissal of counts I-IV is <u>affirmed</u> but on grounds of inadequacy; the dismissal of counts V-VIII is <u>vacated</u> insofar as they assert fraud and breach of fiduciary duty with respect to the bridge financing but otherwise <u>affirmed</u> on grounds of inadequacy; and the case is <u>remanded</u> to the district court for further proceedings not inconsistent with this decision. Each side shall bear its own costs on this appeal.

<u>It is so ordered</u>.