UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Dana E. Moody

    v.

                                Civil No. 16-cv-021-JL
                                Opinion No. 2018 DNH 066

PennyMac Loan Services, LLC,
et al.

## MEMORANDUM ORDER

In this twice-consolidated action, pro se plaintiff Dana E. Moody alleges that PennyMac Loan Services, LLC, PennyMac Holdings, LLC, and PennyMac Mortgage Investment Trust Holdings I, LLC,[1] violated state and federal law with respect to a mortgage on property Moody co-owned in New Boston, New Hampshire. Broadly speaking, Moody's eight-count consolidated complaint[2] alleges three categories of claims. In four counts, Moody alleges that PennyMac undertook actions with respect to the mortgage that violated New Hampshire common and statutory law, resulting in pecuniary harm to Moody and his property being sold at a foreclosure auction. In two other counts, Moody alleges that PennyMac violated federal and state debt collection practices law. And in the remaining two counts, Moody alleges

---

[1] As the defendants do not distinguish between one another in a way that would impact the determinations in this Memorandum Order, the court will refer to them singularly as PennyMac.

[2] Consolidated Complaint (doc. no. 69) ("Compl.").

violations of the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. § 2601 et seq.

The court has subject-matter jurisdiction over this action by virtue of Moody's federal statutory claims. See 28 U.S.C. § 1331. As the parties are diverse and the amount in controversy exceeds $75,000, this matter also falls within this court's diversity jurisdiction. See 28 U.S.C. § 1332(a). PennyMac moves to dismiss the complaint in its entirety for failure to state a claim. See Fed. R. Civ. P. 12(b)(6). Alternatively, PennyMac contends this action should be dismissed because Moody failed to join a necessary party. See Fed. R. Civ. P. 12(b)(7).

The court grants PennyMac's motion to dismiss pursuant to Rule 12(b)(6) in part. The court dismisses Moody's common-law fraud claim, as it fails to meet the heightened pleading requirements under Rule 9(b). The court likewise dismisses Moody's claim brought under N.H. Rev. Stat. Ann. § 479:25, because Moody concedes that this count does not constitute an independent claim. The court also dismisses Moody's wrongful foreclosure claim, concluding that it is time-barred under N.H. Rev. Stat. Ann. § 479:25, II(c) and II-a. The court similarly dismisses Moody's breach of contract claim insofar as it challenges the validity of the foreclosure and the notice PennyMac provided Moody of the foreclosure sale, concluding that such arguments, too, are untimely under § 479:25. Lastly, the

2

court dismisses Moody's claim under 12 C.F.R. § 1024.40 because § 1024.40 does not confer a private right of action and, in any event, Moody has failed to state a violation of that section.

PennyMac's motion is otherwise denied. At this stage of the litigation, Moody has pleaded facts that support his breach of contract claim on bases not impacted by § 479:25. Moody has also alleged that PennyMac engaged in conduct violating the federal Fair Debt Collections Practices Act ("FDCPA") and its state counterpart, the New Hampshire Unfair, Deceptive or Unreasonable Collection Practices Act ("UDUCPA"). Similarly, Moody's RESPA claims other than the one brought under § 1024.40 present issues of law and fact that preclude their dismissal at this juncture. And finally, to the extent brought under Rule 12(b)(7), the court denies PennyMac's motion, as its joinder arguments present issues that cannot be resolved on the present record.

## I.   Rule 12(b)(6)

### A.   Applicable legal standard

"A pleading that states a claim for relief must contain," among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this requirement, a plaintiff must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

3

misconduct alleged." Martinez v. Petrenko, 792 F.3d 173, 179 (1st Cir. 2015). In ruling on a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts set forth in the complaint and draws all reasonable inferences in the plaintiff's favor. See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010). In light of Moody's pro se status, the court liberally construes his pleadings. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam).

Although the court ordinarily will not consider documents outside the pleadings in ruling on a motion to dismiss, "[w]hen the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). Moody attaches thirty exhibits to his complaint and cites to each in the complaint itself. PennyMac does not dispute their authenticity. Accordingly, these documents, in conjunction with the factual allegations in the complaint, inform the following background.

B.  **Background**

In 2006, Moody and Aaron McKenzie refinanced their home in New Boston, New Hampshire.[3] They executed a promissory note

---

[3] Compl. (doc. no. 69) ¶ 7.

4

secured by a mortgage on the property.[4]  In 2010, CitiMortgage, which at that time owned the note and serviced the mortgage,[5] sold the note and assigned the servicing rights to PennyMac.[6]

On May 1, 2012, Moody and McKenzie entered into a loan modification with PennyMac under the Home Affordable Modification Program ("HAMP").[7]  On August 22, 2013, after they both lost their jobs, PennyMac approved an unemployment forbearance program.[8]  This program permitted Moody and McKenzie to make reduced payments as long as they were actively seeking employment, with the first payment due on October 1, 2013.[9]  The program had a minimum term of twelve months or until the Moody and McKenzie reestablished employment, whichever occurred sooner.[10]  Once they were again employed, Moody and McKenzie would have to apply for a subsequent HAMP modification to clear up any resulting deficiency.[11]

---

[4] Id. ¶¶ 7-8.

[5] Id. ¶¶ 11-12.

[6] Id. ¶ 18.

[7] See id. ¶¶ 24-26.

[8] Id. ¶¶ 27-30; Compl. Ex. 4 (doc. no. 69-4).

[9] Compl. (doc. no. 69) ¶¶ 29, 31; Compl. Ex. 4 (doc. no. 69-4) at 1-2.

[10] Compl. (doc. no. 69) ¶ 31; Compl. Ex. 4 (doc. no. 69-4) at 2.

[11] Compl. (doc. no. 69) ¶ 29.

Moody secured employment in January 2014.[12]  As McKenzie remained unemployed, however, he and Moody continued to make payments under the unemployment forbearance program.[13]  In April 2014, PennyMac sent Moody and McKenzie a notice of default and intent to accelerate.[14]  Upon receipt of this notice, Moody and McKenzie contacted PennyMac, which indicated that the notice was a mere formality and assured them that they would not lose the property while making payments as required under the unemployment forbearance program.[15]

McKenzie found a job in June 2014.[16]  He and Moody started the HAMP modification process, but were delayed in submitting the application as they waited for paystubs from McKenzie's new employer.[17]  On June 23, 2014, they received a letter from PennyMac returning their June 1, 2014 payment.[18]  The letter, dated June 18, 2014, indicated that PennyMac was returning the payment because it was insufficient to make a full payment and

---

[12] Id. ¶ 33.

[13] Id. ¶¶ 33-35.

[14] Id. ¶ 34; Compl. Ex. 7 (doc. no. 69-7).

[15] Compl. (doc. no. 69) ¶ 35.

[16] Id. ¶ 36.

[17] Id.

[18] Id. ¶ 37; Compl. Ex. 8 (doc. no. 69-8).

was not made with certified funds.[19]  PennyMac had accepted and applied each of the previous eight payments, none of which was made in full or with certified funds.[20]

On June 25, 2014, Moody and McKenzie received a letter from an attorney at Marinosci Law Group, P.C.[21]  The letter indicated that Marinosci represented PennyMac and advised Moody and McKenzie that they were in default of the note and that PennyMac had accordingly elected to accelerate.[22]  Though dated June 13, 2014, tracking information from the United States Postal Service indicates that the letter was not sent until June 23, 2014.[23]

On June 26, 2014, Moody and McKenzie submitted their HAMP application to PennyMac.[24]  Along with their application, they included a certified bank check in the same amount PennyMac

---

[19] Compl. (doc. no. 69) ¶ 37; Compl. Ex. 8 (doc. no. 69-8) at 1.

[20] Compl. (doc. no. 69) ¶ 38.

[21] Id. ¶ 39; Compl. Ex. 9 (doc. no. 69-9).

[22] Compl. Ex. 9 (doc. no. 69-9) at 1-2.

[23] Compl. (doc. no. 69) ¶ 40; Compl. Ex. 10 (doc. no. 69-10) at 1.

[24] The complaint is ambiguous as to whether this application was submitted on June 26, 2014, or July 6, 2014.  Compare Compl. (doc. no. 69) ¶ 36 with id. ¶¶ 42-43.  In his objection, Moody clarifies that he and McKenzie submitted the application on June 26, 2014.  See Obj. (doc. no. 72) at 8.

previously rejected as insufficient.[25]  PennyMac accepted this

payment and applied it against the mortgage on June 30, 2014,

indicating that it received the HAMP application no later than

that date.[26]

On July 8, 2014, McKenzie received a notice of sale

indicating that the property would be sold at auction on July

22, 2014, at 10:00 AM.[27]  Tracking data indicates that this

notice was sent on June 27, 2014.[28]  In light of the July 4

holiday, however, McKenzie did not receive the notice until July

2014.[29]  Moody, who by this time was incarcerated,[30] did not

receive the notice of sale until July 16, 2014.[31]

On July 17, 2014, Moody started making "frantic" calls to

PennyMac attempting to stop the foreclosure sale.[32]  During these

calls, Moody "specifically disputed the existence of a default,

---

[25] Compl. (doc. no. 69) ¶ 45.

[26] Id.

[27] Id. ¶ 48; Compl. Ex. 11 (doc. no. 69-11).

[28] Compl. (doc. no. 69) ¶ 49; Compl. Ex. 12 (doc. no. 69-12).

[29] Compl. (doc. no. 69) ¶ 51.

[30] Though Moody does not mention his incarceration in the complaint, his objection makes clear that he was incarcerated at the time the notice of sale was sent.  See, e.g., Obj. (doc. no. 72) at 3.

[31] Compl. (doc. no. 69) ¶ 52.

[32] Id. ¶ 53.

disputed the amount of the debt [reflected in the notice of default and notice of acceleration], and emphasized that a loss mitigation application had been submitted."[33]  PennyMac ultimately indicated that it would review the loss-mitigation application, obtain a verification of the default and debt, and issue a reply.[34]  PennyMac refused to postpone or cancel the foreclosure.[35]  On July 21, 2014, Moody contacted various state agencies and attorneys in an attempt to stop the foreclosure.[36]

On July 22, 2014, the property sold at a foreclosure auction for $286,448.00.[37]  As of that date, Moody and McKenzie had made all payments as required under the unemployment forbearance plan.[38]  PennyMac did not respond to their loss-mitigation application prior to the foreclosure sale.[39]  The

---

[33] Id. ¶ 54.  Throughout their filings, both parties refer to the HAMP modification application submitted on June 26, 2014, as a "loss-mitigation application."  The court will do the same in this Memorandum Order so as to distinguish this application from the earlier modification.

[34] Compl. (doc. no. 69) ¶ 55.

[35] Id. ¶ 56.

[36] Id. ¶ 57-58.

[37] Id. ¶¶ 59, 65.

[38] Id. ¶ 61.

[39] Id. ¶ 59.

9

foreclosure deed was recorded on August 28, 2014.[40]  Following the foreclosure, Moody alleges that he was "devastated . . . and therefore was not physically, emotionally, or financially able to pursue the matter."[41]

In January 2015, Moody and McKenzie received an Acquisition or Abandonment of Secured Property, Form 1099-A, which indicated a principal balance of $549,892.07 and a fair market value of $286,448.00, leaving a deficiency of $263,444.07.[42]  The following month, Moody received a letter from Stawiarski & Associates, P.C., advising Moody that it was "deemed to be a debt collector" under the FDCPA, that it was "attempting to collect a debt," and that it was "acting solely in its capacity as a debt collector."[43]  Stawiarski further advised Moody that it represented PennyMac and indicated that Moody owed PennyMac a deficiency balance of $294,258.57 on the mortgage, of which $281,052.93 was unpaid principal and $13,205.64 was unpaid

---

[40] Though Moody does not provide this date in the complaint, he does include it in his objection.  See Obj. (doc. no. 72) at 4.  PennyMac does not appear to dispute this allegation.

[41] Compl. (doc. no. 69) ¶ 63.

[42] Id. ¶¶ 63, 65; Compl. Ex. 13 (doc. no. 69-13) at 1.

[43] Compl. (doc. no. 69) ¶ 66; Compl. Ex. 14 (doc. no. 69-14) at 1.

interest.[44]  Though unable at that time to access any loan documents, Moody believed that these amounts were inconsistent with the terms of the loan, particularly given that they differed from the amounts included in the Form 1099-A.[45]

The mortgage was subsequently paid off for $247,076.07.[46] Of this amount, $229,185.14 was applied to principal and $17,890.93 was applied to escrow.[47]  On December 15, 2015, the mortgage was officially discharged.[48]

As Moody recovered from physical, emotional, and financial trauma, he began investigating the foreclosure and PennyMac's servicing of the mortgage.[49]  On February 25, 2015, Moody sent PennyMac the first in a series of letters requesting documents from PennyMac and/or asserting errors Moody believed PennyMac made in servicing the mortgage.[50]  Moody sent additional letters

---

[44] Compl. Ex. 14 (doc. no. 69-14) at 1; Compl. (doc. no. 69) ¶ 67.

[45] Compl. (doc. no. 69) ¶ 68.

[46] Id. ¶ 69.  There is no indication in the record how this occurred.

[47] Compl. (doc. no. 69) ¶ 69.

[48] Id.

[49] Id. ¶ 70.

[50] See generally id. ¶¶ 71-93.  With a few exceptions, Moody attaches the letters, PennyMac's acknowledgments, and PennyMac's responses (such as they exist) to his complaint.  The February

11

on April 27, 2015, August 10, 2015, October 13, 2015, and March 23, 2016.[51] PennyMac acknowledged receipt of all five letters[52] and responded substantively to the first two.[53] PennyMac did not provide a substantive response to the letters dated August 10 and October 13, 2015.[54] On May 3, 2015, PennyMac's counsel in this case sent Moody a letter purporting to respond to the March 23, 2016 letter.[55]

---

25, 2015 letter is attached to the complaint as exhibit 15.  See Compl. Ex. 15 (doc. no. 69-15).

[51] Compl. Exs. 17, 20, 23, 25 (doc. nos. 69-17, 69-20, 69-23, 69-25).  Moody also sent a letter to Marinosci on September 8, 2015, requesting five categories of documents.  See Compl. Ex. 22 (doc. no. 69-22).  While Moody discusses this letter in the complaint, and attaches the letter as an exhibit, he concedes in his objection to the motion to dismiss that this letter is without legal significance.  See Obj. (doc. no. 72) at 10-11. As such, the court need not further address the September 8, 2015 letter.

[52] Compl. Exs. 18, 21, 24, 26 (doc. nos. 69-18, 69-21, 69-23, 69-25).  Though Moody does not attach PennyMac's acknowledgment of the February 25, 2015 letter, there does not appear to be any dispute that such acknowledgement was sent.

[53] Compl. Exs. 16, 19 (doc. nos. 69-16, 69-19).

[54] Compl. (doc. no. 69) ¶¶ 86, 92.

[55] PennyMac attaches a portion of this letter to its motion to dismiss.  Mot. to Dismiss Ex. 4 (doc. no. 70-4) at 2-3. PennyMac provides the full letter as an attachment to its earlier motion to dismiss Moody's second-amended complaint, see doc. no. 58-3, which was mooted by the consolidated complaint, see Sept. 25, 2017 Endorsed Order.

In reviewing the information PennyMac provided in response to the February 25 and April 27, 2015 letters, Moody determined that PennyMac had committed several errors while servicing the mortgage.[56] Among other things, these errors included incorrect principal and interest calculations and an inaccurate amortization schedule under the 2012 modification.[57] Moody accordingly filed a complaint with the New Hampshire Banking Department, reporting these errors.[58] In its initial responses to Moody's complaint, dated September 4 and December 9, 2015, PennyMac indicated that it had reviewed the mortgage account and had not identified any errors.[59] PennyMac attached updated loan history statements to each response.[60] The Banking Department thereafter independently determined that the monthly payments and amortization table under the 2012 modification were incorrect and sent its findings to PennyMac.[61] In a letter dated

---

[56] See Compl. (doc. no. 69) ¶¶ 79-82.

[57] Id. ¶ 81.

[58] Id. ¶ 82.

[59] Id. ¶ 100.

[60] Id.

[61] Id. ¶ 101.

13

February 10, 2016, PennyMac acknowledged these errors and sent Moody a refund check and updated loan history statement.[62]

Moody did not deposit the refund check, instead electing to review the documents PennyMac provided with its September 4 and December 9, 2015 responses to the Banking Department.[63] In doing so, Moody identified additional errors and concluded that the refund check was for the incorrect amount.[64] Moody returned the refund check to the Banking Department, which sent the check to PennyMac and demanded a response.[65] In a letter dated August 25, 2016, PennyMac admitted to a calculation error and issued a corrected refund check, which Moody reviewed and deposited.[66] PennyMac also provided Moody with an updated loan history statement.[67]

After depositing the refund check, Moody reviewed the last of the documents PennyMac provided with its February 10 and August 25, 2016 letters.[68] Moody identified several additional

---

[62] Id. ¶ 102.

[63] Id. ¶ 103.

[64] Id. ¶¶ 104-105.

[65] Id. ¶ 106.

[66] Id. ¶ 107.

[67] Id.

[68] Id. ¶ 108.

errors in these documents.[69]  These errors, along with errors

Moody previously identified but PennyMac did not correct,

resulted in Moody making overpayments on the mortgage account or

otherwise not being credited for amounts to which he was

entitled.[70]  Moody seeks, among other things, to recover these

amounts as part of this lawsuit.[71]

### C.    <u>Analysis</u>

As previously mentioned, Moody broadly alleges three

categories of claims.  The first category, comprising Moody's

breach of contract (Count 1), fraud (Count 2), wrongful

foreclosure (Count 3), and § 479:25 (Count 5) claims, challenges

PennyMac's conduct up to and including the foreclosure.  The

second category alleges violations of federal (Count 6) and

state (Count 7) debt collection practices laws.  The third

category alleges violations of RESPA for failure to maintain

contact with Moody and provide Moody with accurate information

(Count 4), for failure to review Moody and McKenzie's loss-

mitigation application prior to foreclosing on the property

---

[69] <u>Id.</u>

[70] <u>Id.</u> ¶ 109.

[71] The complaint contains a detailed discussion of each purported
error.  <u>See</u> Compl. (doc. no. 69) ¶¶ 111–126.  In the interest of
brevity, and because the specifics of each error do not impact
the resolution of PennyMac's motion, the court does not list
them here.

(also Count 4), and for failure to adequately respond to numerous qualified written requests that Moody sent after the foreclosure (Count 8). Guided by these categories, the court considers each of Moody's claims in turn.

### 1. Breach of contract (Count 1)

Moody alleges that PennyMac breached the loan agreement by failing to service the mortgage in accordance with the agreement and by foreclosing on the property without the authority to do so. PennyMac contends that § 479:25, II(c) bars this count, as Moody did not seek to enjoin the foreclosure prior to the foreclosure sale. PennyMac further argues that to the extent Moody challenges the notice or manner of notice it provided of the foreclosure sale, this claim is untimely under § 479:25, II-a. Alternatively, PennyMac contends that Moody has failed to adequately plead breach of contract.

The court turns first to § 479:25. This statute "sets forth the procedures for mortgage foreclosure through the power of sale." Bank of N.Y. Mellon v. Dowgiert, 169 N.H. 200, 204 (2016) (citation omitted). "Those procedures require, among other things, that the foreclosing party give notice of the foreclosure to the mortgagor." Id. (citing N.H. Rev. Stat. Ann. § 479:25, I). "[Section] 479:25, II requires that notice be served upon the mortgagor or sent by registered or certified mail to his last known address at least 25 days before the

16

foreclosure sale." Id. (ellipsis, brackets, and internal quotation marks omitted) (quoting N.H. Rev. Stat. Ann. § 479:25, II). "The statute also requires that, in the notice, the foreclosing party advise the mortgagor of his right to petition the superior court to enjoin the scheduled foreclosure sale." Id. (ellipsis and internal quotation marks omitted) (quoting N.H. Rev. Stat. Ann. § 479:25, II).

A mortgagor exercising his right to petition the superior court must "institute such petition . . . prior to sale." N.H. Rev. Stat. Ann. § 479:25, II(c). Failure to do so "bar[s] any action or right of action of the mortgagor based on the validity of the foreclosure," id., when that action is premised on "facts which the mortgagor knew or should have known soon enough to reasonably permit the filing of a petition prior to the sale," Murphy v. Fin. Dev. Corp., 126 N.H. 536, 540 (1985). Additionally, "[n]o claim challenging the form of notice, manner of giving notice, or the conduct of the foreclosure shall be brought by the mortgagor . . . after one year and one day from the date of the recording of the foreclosure deed for such sale." N.H. Rev. Stat. Ann. § 479:25, II-a.

Moody does not dispute that he did not seek to enjoin the foreclosure prior to the foreclosure sale. Instead, he raises a litany of arguments as to why this is not fatal to his breach of

17

contract claim.  With one exception, Moody's arguments do not overcome this statutory preclusion.

First, Moody argues that § 479:25 only bars claims based on a mortgagee's failure to adhere to the specific terms of that statute.  Moody does not cite, and the court cannot find, any support for this proposition.  Rather, Moody's reading is inconsistent both with the plain language of statute, see N.H. Rev. Stat. Ann. § 479:25, II(c) (barring "any action or right of action . . . based on the validity of the foreclosure" (emphasis added)), and state and federal decisions applying its terms, see, e.g., Bank of N.Y. Mellon, 169 N.H. at 205-06 (holding that a plea of title constitutes an "action or right of action" under § 479:25, II(c)); Butterfield v. Deutsche Bank Nat'l Trust, 2017 DNH 054, 4 (Barbadoro, J.) (ruling that § 479:25, II(c) barred a breach of contract claim).  The court therefore declines to read § 479:25 so narrowly.

Next, Moody avers that he did not possess sufficient information to challenge the foreclosure prior to the sale.  To this end, Moody notes that he did not determine the extent of PennyMac's servicing errors until after the foreclosure occurred.  But Moody himself concedes that he and McKenzie received a notice of default from Marinosci in advance of the sale.  He similarly notes, both in his complaint and the objection to the motion to dismiss, that he called PennyMac

18

after receiving the notice of sale to dispute the default and attempted to stop the foreclosure. Thus, Moody, by his own admission, knew the essential facts underlying his claim — namely, that PennyMac elected to foreclose on the property based on the mistaken belief that Moody and McKenzie were in default — prior to the foreclosure sale. That Moody did not determine the full extent of the errors leading to that mistaken belief until later does not save his claim.[72]

Perhaps recognizing this shortcoming, Moody alternatively argues that he did not receive the notice of sale with

---

[72] By holding in Murphy that § 479:25, II(c) bars claims based on facts the mortgagor "knew or should have known soon enough to reasonably permit the filing of a petition prior to the sale," the New Hampshire Supreme Court in essence read into that statute the discovery rule applicable to New Hampshire's general three-year statute of limitations for personal actions, see N.H. Rev. Stat. Ann. § 508:4, I ("[An] action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of."). In the latter context, it is well-established that "[t]he discovery rule is not intended to toll the statute of limitations until the full extent of the plaintiff's injury has manifested itself." Feddersen v. Garvey, 427 F.3d 108, 113 (1st Cir. 2005) (quoting Furbush v. McKittrick, 149 N.H. 426, 431 (2003)). Decisions in this district imply that this concept equally extends to § 479:25, II. See, e.g., Khawaja v. Bank of N.Y. Mellon, 2014 DNH 195, 7 (Barbadoro, J.) (finding that the plaintiffs "knew the essential facts that underlie [their] claim[] more than four months before the [foreclosure sale]." (emphasis added)); People's United Bank v. Mountain Home Developers of Sunapee, LLC, 858 F. Supp. 2d 162, 170 (D.N.H. 2012) (holding that § 479:25, II(c) barred a post-foreclosure claim challenging the validity of a foreclosure even when damages only became measurable after the foreclosure sale).

19

sufficient time to petition the superior court prior to the foreclosure. Setting aside that Moody has not explained why he did not receive the notice of sale until eleven days after it was sent, this argument is barred by § 479:25, II-a. Per that statute, claims challenging the form and manner of notice must be brought within "one year and one day of the date of the recording of the foreclosure deed . . . ." N.H. Rev. Stat. Ann. § 479:25, II-a. Moody concedes in his objection that the foreclosure deed was recorded on August 28, 2014. He did not file the first iteration of this action until December 21, 2015.[73] Thus, Moody's arguments with respect to notice are untimely.[74]

---

[73] See Not. of Removal Ex. 1 (doc. no. 1-1) at 4.

[74] Moody asks the court to read into § 479:25, II-a the "knew or should have known" language applied under § 479:25, II(c). He does not provide any precedential support for this request, and both the New Hampshire Supreme Court and this court have strictly construed the "one year and one day" requirement. See Dowgiert, 169 N.H. at 205 (holding that § 479:25, II-a applied to a contention that "the foreclosure notice was inadequate because it was not received when [the defendant] was incarcerated"); Brown v. Wells Fargo Home Mortg., 2017 DNH 094, 9 ("FNMA submits, and plaintiffs do not dispute, that it recorded the foreclosure deed in question on October 21, 2015, over one year and one day before plaintiff filed the instant action on November 28, 2016."). Even were the court to apply such a rule, however, Moody does not argue that he was somehow delayed in discovering inadequacies in the notice PennyMac provided. His notice arguments would therefore still be time-barred.

20

Moody also argues, once again in the alternative, that § 479:25 does not apply because he and McKenzie relied on PennyMac's representation that the foreclosure sale would not occur while their loss-mitigation application was pending. Moody cites Dionne v. Federal National Mortgage Association, 110 F. Supp. 3d 338 (D.N.H. 2015), in support of this argument. In Dionne, Judge McCafferty declined to dismiss an action under § 479:25 when the plaintiffs plausibly alleged that they opted against filing suit because one defendant promised that the foreclosure sale would not go forward while the plaintiffs' loss-mitigation application was pending. 110 F. Supp. 3d at 343. Here, the complaint contains no similar allegation. Rather, Moody alleges that PennyMac expressly told him, just days before the foreclosure sale, that it would not postpone or cancel the sale, and that following this representation, Moody took additional (ultimately unsuccessful) steps to stop the foreclosure. Moody therefore has not plausibly alleged that PennyMac ever represented that it would delay or cancel the foreclosure, let alone that he relied upon such a representation.

Finally, Moody argues that even if § 427:25 bars his breach of contract claim to the extent it challenges the validity of the foreclosure, he has still alleged a breach of contract independent from the foreclosure proceedings. The court agrees.

21

Under New Hampshire law, "a breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 668 (2013) (brackets and citation omitted). Moody alleges that PennyMac committed errors with respect to the mortgage that violated the terms of the loan agreement, and that those errors resulted in Moody making overpayments on the mortgage account or otherwise not being credited for amounts to which he was entitled. As these allegations challenge neither the validity of the foreclosure nor the notice, manner of notice, or conduct of the foreclosure, they are not barred by § 479:25. And, when assumed true, they state a plausible breach of contract claim. Count 1 may therefore proceed insofar as Moody seeks to recover for pecuniary harm, other than the loss of the property, caused by PennyMac's breach of the loan agreement.[75]

---

[75] PennyMac suggests in a footnote in its memorandum that Moody's state-law claims may be barred by the three-year limitations period under N.H. Rev. Stat. Ann. § 508:4, I. See Defendants' Mem. (doc. no. 70-1) at 6 n. 5. The court is disinclined to grant relief based on an underdeveloped argument contained in a single footnote. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

### 2. Fraud (Count 2)

In Count 2, Moody alleges that PennyMac's conduct up to and including the foreclosure constituted fraud. PennyMac contends that Moody has failed to meet Rule 9(b)'s heightened standard for pleading fraud. The court agrees.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This means that a complaint rooted in fraud must specify the who, what, where, and when of the allegedly false or fraudulent representations." Moore v. Mortg. Elec. Registration Sys., Inc., 848 F. Supp. 2d 107, 130 (D.N.H. 2012) (citation omitted). Further, "Rule 9(b) requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter." N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009). A plaintiff may not generally aver "the defendant's 'knowledge' of material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." Id.

Construing his complaint liberally, Moody appears to contend that PennyMac committed fraud both in foreclosing on the property and in servicing the mortgage. As it relates to the foreclosure, Moody has at least arguably alleged that PennyMac

23

falsely represented both that it would not foreclose while Moody and McKenzie were making timely payments under the unemployment forbearance plan and, later, that Moody and McKenzie were in default of the mortgage when they were not. But even assuming the falsity of these statements, Moody has not identified any basis to infer that PennyMac knew that they were false or misleading at the time they were made. He has therefore failed to allege that PennyMac made these misrepresentations with the requisite scienter to sustain a fraud claim under Rule 9(b).

Moody's claim with respect to the servicing is more deficient still. Moody contends that PennyMac's numerous servicing errors "cumulatively constitute a pattern or practice of fraudulent behavior . . . ."[76] Though Moody alleges the servicing errors in detail, he does not point to any false or fraudulent representation attributable to PennyMac, let alone facts from which the court might infer PennyMac knew its statements were false or misleading. Thus, to the extent Moody's fraud claim rests upon the servicing errors, he has failed to meet either of Rule 9(b)'s pleading requirements.[77]

_____

[76] Compl. (doc. no. 69) ¶ 110.

[77] The complaint contains other stray references to fraud. See, e.g., Compl. (doc. no. 69) ¶¶ 135, 155, 159, 162, 164. As these references are bereft of factual support, they are "not entitled to the assumption of truth," Maldonado v. Fontanes, 568 F.3d

### 3. Wrongful foreclosure (Count 3)

In Count 3, Moody alleges that PennyMac wrongfully foreclosed in violation of New Hampshire common law. PennyMac contends that § 479:25 bars this claim. In response, Moody raises the same arguments he raised with respect to Count 3.

Moody's wrongful foreclosure claim comprises four substantive paragraphs. In the first three, Moody challenges PennyMac's authority to foreclose. Section 479:25, II(c) equally applies to these arguments for the reasons discussed supra Part I.C.1. Thus, Count 3 is untimely to the extent it challenges the validity of the foreclosure.

Moody also alleges that "[t]he sale price accepted by [PennyMac] at the foreclosure auction was not adequate of [sic] the value of the real property."[78] Construed liberally, this can be read as an allegation that PennyMac failed to exercise good faith and due diligence in obtaining a fair price for the property at the foreclosure. See Murphy, 126 N.H. at 540-45 (discussing this duty). As such claims cannot, by their very nature, be brought prior to the foreclosure sale, courts in this district have concluded that they are not subject to § 479:25,

---

263, 268 (1st Cir. 2009) (citation omitted), and accordingly do not save Count 2.

[78] Compl. (doc. no. 69) ¶ 141.

25

II(c).  See, e.g., People's United Bank v. Mountain Home Developers of Sunapee, LLC, 858 F. Supp. 2d 162, 168 (D.N.H. 2012); Butterfield, 2017 DNH 054, 4 n. 3 (citing Dugan v. Manchester Fed. Sav. & Loan Ass'n, 92 N.H. 44, 44 (1942)).  But even so, this claim remains time-barred by § 479:25, II-a, as it challenges the conduct of the foreclosure sale and was not brought within one year and one day of the date PennyMac recorded the foreclosure deed.  See id. ("No claim challenging . . . the conduct of the foreclosure shall be brought by the mortgagor . . . after one year and one day from the date of the recording of the foreclosure deed for such sale.").

        4.    N.H. Rev. Stat. Ann. § 479:25 (Count 5)

    Through Count 5, Moody purports to allege violations of § 479:25.  Yet Moody concedes, both in the complaint and in his objection, that he does not seek damages under this count, and merely brings it to support his other claims.[79]  In light of these concessions, the court declines to construe Count 5 as an independent claim for relief.  The court dismisses Count 5 on this basis.

---

[79] See Compl. (doc. no. 69) ¶ 152; Obj. (doc. no. 72) at 2.

## 5.   Debt collection practices (Counts 6 and 7)

In Counts 6 and 7, Moody alleges that PennyMac collected and/or attempted to collect debts from Moody to which it was not entitled.  Before turning to the substance of these claims, the court must address a preliminary matter with respect to Count 6.

In the complaint, Moody purports to bring Count 6 under the Truth in Lending Act ("TILA").[80]  PennyMac contends, among other things, that "TILA does not relate to or regulate debt collection after origination of the loan," and that Count 6 is accordingly untimely under TILA's one-year limitations period.[81]  In his objection, Moody again references TILA, but notes that he intended to allege violations of 15 U.S.C. § 1692.[82]  PennyMac correctly notes in its reply that 15 U.S.C. § 1692 falls under the FDCPA, not TILA, and argues that "[n]othing in the [c]onsolidated [c]omplaint gave [PennyMac] any notice that the claim was pleaded under the FDCPA . . . ."[83]  PennyMac therefore urges the court to ignore what it characterizes as Moody's "new allegations."[84]  In response, Moody moves to "clarify" the

---

[80] Compl. (doc. no. 69) at 13, ¶ 141.

[81] Defendants' Mem. (doc. no. 70-1) at 7.

[82] Obj. (doc. no. 72) at 8-9.

[83] Defendants' Reply (doc. no. 75) at 3-4.

[84] Id. at 4.

complaint to include an explicit reference to 15 U.S.C. § 1692 in his title to Count 6.[85]

While it is true that the complaint references TILA rather than the FDCPA, the court is disinclined to elevate form over substance and dismiss Count 6 on this basis. "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997); cf. Castro v. United States, 540 U.S. 375, 381 (2003) (noting that federal courts sometimes recharacterize pro se filings to avoid "unnecessary dismissal[s]" and "inappropriately stringent application of formal labeling requirements"). In Count 6, Moody specifically asserts that PennyMac "is a debt collector," which "illegally attempted to collect, and actually collected[,] money from [Moody] that was [it] was not owed . . . ."[86] This language supports a reasonable conclusion that Moody sought to bring a debt collection practices claim. That Count 7, brought under the "state-law analog" to FDCPA, Moore, 848 F. Supp. 2d at 123, contains nearly identical language only enhances this

---

[85] See Mot. to Clarify (doc. no. 76). PennyMac objects to this motion. See Obj. to Mot. to. Clarify (doc. no. 77).

[86] Compl. (doc. no. 69) ¶ 155.

suggestion.  And Moody's citation in his objection to 15 U.S.C. § 1692 provides further clarity still.  In light of these facts, and mindful that pro se filings should be read "with an extra degree of solicitude," Moore, 484 F. Supp. 2d at 122 n. 8, the court construes Count 6 to be brought under the FDCPA.[87]

The court turns, then, to the claims themselves.  "To succeed on a claim under the FDCPA, a plaintiff must show that '(1) [he] was the object of collection activity arising from consumer debt, (2) defendants are debt collectors as defined by the FDCPA, and (3) defendants engaged in an act or omission prohibited by the FDCPA.'" Farrin v. Nationstar Mortg. LLC, 2016 DNH 178, 9 (quoting Jones v. Experian Information Solutions, No. 14-10218-GAO, 2016 WL 3945094, at *3 (D. Mass. July 19, 2016)).  New Hampshire's UDUCPA similarly "bars a debt collector from 'collecting or attempting to collect a debt in an unfair, deceptive or unreasonable manner as defined [by the UDUCPA]." Moore, 848 F. Supp. 2d at 125 (brackets omitted) (quoting N.H. Rev. Stat. Ann. § 358-C:2).  An attempt to collect a debt is unfair, deceptive, or unreasonable if, among other things, the debt collector "[m]akes any material false

---

[87] The court accordingly denies Moody's motion to clarify (doc. no. 76) as moot.

29

representation or implication of the character, extent or amount of the debt . . . ." N.H. Rev. Stat. Ann. § 358-C:3, VII.

Seemingly relying on its argument that the court should "not consider" Count 6 under the FDCPA, PennyMac fails to address whether Moody adequately pleads a violation of that statute. The court therefore declines to dismiss Count 6, albeit without prejudice to PennyMac raising this argument at the Rule 56 stage.

PennyMac does raise substantive arguments with respect to Count 7: namely, that Moody neither invokes a specific section of the UDUCPA that he believes PennyMac violated nor points to facts otherwise demonstrating that PennyMac collected or attempted to collect a debt in an unfair, deceptive, or unreasonable manner. In response, Moody contends, inter alia, that he has alleged that in attempting to collect on the mortgage, PennyMac "falsely represented the amount of the debt . . . ."[88] At this stage in the proceedings, Moody has the better argument. In the complaint, Moody alleges that following the foreclosure, Stawiarski sent Moody a letter seeking to collect the deficiency balance on the mortgage. In this letter, Stawiarski indicated that it had been retained by PennyMac, and advised Moody it was "deemed to be a debt collector" under the

---

[88] Obj. (doc. no. 72) at 9.

FDCPA, that it was "attempting to collect a debt," and that it was "acting solely in its capacity as a debt collector."[89]  Moody disputes the amount of the deficiency balance sought, which he contends was based on servicing errors.  Construing these allegations liberally, Moody has alleged that PennyMac, through Stawiarski, falsely represented the extent or amount of the deficiency when attempting to collect the deficiency balance. Moody has therefore stated a claim under § 358-C:3, VII.

### 6.    RESPA (Count 4)

In Count 4, Moody asserts two distinct RESPA violations. First, Moody contends that PennyMac violated 12 C.F.R. § 1024.40 by "fail[ing] to maintain contact with [Moody] and to provide [Moody with] accurate information . . . ."[90]  Next, Moody avers that PennyMac violated 12 C.F.R. § 1024.41 by failing to review his and McKenzie's loss-mitigation application prior to foreclosing on the property.  PennyMac does not address § 1024.40 in either its motion to dismiss or its reply to Moody's objection.  PennyMac contends that Moody fails to state a claim under § 1024.41 because Moody and McKenzie did not submit their loss-mitigation application more than 37 days

---

[89] Compl. Ex. 14 (doc. no. 69-14) at 1.

[90] Compl. (doc. no. 69) ¶ 144.

31

before the foreclosure sale.  The court considers each provision in turn.

Generally speaking, § 1024.40 requires that mortgage servicers enact certain policies and procedures to govern their communications with delinquent borrowers.  See 10 C.F.R. § 1024.40(a)-(b).  Courts addressing this provision have routinely held that it does not confer a private right of action.  See, e.g., Joussett v. Bank of Am., N.A., No. CV 15-6318, 2016 WL 5848845, at *5 (E.D. Pa. Oct. 6, 2016) (no private right of action under § 1024.40); Brown v. Bank of N.Y. Mellon, No. 1:16-CV-194(LMB/IDD), 2016 WL 2726645, at *2 (E.D. Va. May 9, 2016) (same); Schmidt v. PennyMac Loan Servs., LLC, 106 F. Supp. 3d 859, 868 (E.D. Mich. 2015) (same); see also Cilien v. U.S. Bank Nat'l Ass'n, 687 F. App'x 789, 792 n. 2 (11th Cir. 2017) (noting in dicta that "the regulations set forth in sections 1024.39 and 1024.40 provide no private cause of action").  Courts so hold because, unlike other sections of 12 C.F.R. § 1024, section 1024.40 does not contain language authorizing a borrower to enforce its terms.  Compare, e.g., 12 C.F.R. § 1024.41(a) ("A borrower may enforce the provisions of this section . . . .") with id. § 1024.40 (no similar language). Unable to identify any contrary authority, the court finds these decisions persuasive.  And, in any event, Moody has failed to state a claim under § 1024.40 because he solely takes umbrage

with how PennyMac communicated with *him*.  See Cilien, 687 F. App'x at 792 ("Plaintiff makes no allegation that U.S. Bank failed to enact such policies. Instead, Plaintiff asserts that U.S. Bank failed to provide accurate information to her about the loss-mitigation process."); Hines v. Regions Bank, No. 5:16-CV-01996-MHH, 2018 WL 905364, at *5 (N.D. Ala. Feb. 15, 2018) ("Hines does not allege that Regions failed to implement policies . . . . , only that Regions did not achieve those objectives in handling his mortgage delinquency.").  For these reasons, the Court dismisses Count 4 to the extent brought under § 1024.40.

Under § 1024.41, a servicer is, with certain exceptions, prohibited from foreclosing "[i]f a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale . . . ." 12 C.F.R. § 1024.41(g).  PennyMac contends that the earliest Moody alleges he and McKenzie filed their loss-mitigation application was June 26, 2014, only 26 days before the foreclosure sale.  Moody does not dispute this point, but argues that it was factually impossible for him and McKenzie to submit a completed loss-mitigation application more than 37 days before the foreclosure sale, at least in part

33

because Moody did not receive notice of the foreclosure sale until six days before it occurred.

It is unclear whether RESPA and its associated regulations provide for relief under such circumstances. The parties offer no authority on the subject. The court accordingly denies PennyMac's motion to dismiss this claim without prejudice to more thorough argumentation under Rule 56 or Rule 50 at trial.

### 7. RESPA (Count 8)

"RESPA requires the servicer of a federally-related mortgage loan to respond to certain borrower inquiries, which the statute terms 'qualified written requests.'" O'Connor v. Nantucket Bank, 992 F. Supp. 2d 24, 34 (D. Mass 2014) (citing 12 U.S.C. § 1605). In Count 8, Moody alleges that the February 25, 2015, April 27, 2015, August 10, 2015, October 13, 2015, and March 23, 2016 letters constituted qualified written requests ("QWRs"). He asserts that PennyMac failed to adequately respond to these letters as required by RESPA.

Before turning to the substance of this claim, the court must address a few preliminary issues. First, PennyMac argues that it was under no obligation to respond to Moody's letters because they were sent after the foreclosure sale. To this end, PennyMac asserts, with citations to two cases out of the Northern District of California, that "a servicing relationship

34

usually ends at the time of the foreclosure sale."[91]  Moody has, however, plausibly alleged in this case that PennyMac retained servicing rights after the foreclosure.  Moody asserts in the complaint that PennyMac continued to service the mortgage through at least August 26, 2016.[92]  Additionally, PennyMac's written acknowledgement of Moody's October 15, 2015 letter, itself dated October 19, 2015, indicated that PennyMac was "the current loan servicer."[93]  The court accordingly declines to dismiss this claim based on the servicing relationship at this stage of the litigation.

PennyMac also argues that three of Moody's letters — those dated August 10, 2015, October 13, 2015, and March 23, 2016 — are untimely under 12 C.F.R. § 1024.36(f)(v)(B) because they were delivered more than one year after the mortgage loan was discharged.  PennyMac contends that the mortgage was discharged on July 22, 2014, the date of the foreclosure sale.  Moody, however, alleges that PennyMac, through Stawiarski, attempted to collect a mortgage deficiency in February 2015.  Moody further alleges that the mortgage was subsequently paid off, and that it was ultimately discharged on December 15, 2015.  Crediting these

---

[91] Defendants' Mem. (doc. no. 70-1) at 19 n. 9.

[92] Compl. (doc. no. 69) ¶ 60.

[93] Compl. Ex. 24 (Doc. no. 69-24) at 1.

35

allegations, as the court must at this stage, Moody has alleged that these three letters were delivered within the one-year timeframe established by 12 C.F.R. § 1024.36(f)(v)(B).

Nor will the court dismiss Count 8 on its merits. PennyMac contends that it fully responded to any valid QWRs that Moody sent. Moody has alleged, however, that he sent QWRs to which PennyMac did not respond at all, or to which it failed to adequately respond. He thus pleads facts in support of his QWR claim.

PennyMac concedes that it did not respond to the August 10 and October 13, 2015 letters. But PennyMac contends it did not need to, because § 1024.36(f)(1) exempted it from responding to at least some of the requests in those letters. Under § 1024.36(f)(1), a servicer need not provide responsive information when a request is overbroad or unduly burdensome or seeks, among other things, duplicative or irrelevant information. See 12 C.F.R. § 1024.36(f)(1)(i)-(v). Section 1024.36(f)(1) does not wholly obviate the need to respond, however; rather § 1024.36(f)(2) requires a servicer to provide a borrower written notice "set[ting] forth the basis under paragraph of [§ 1024.36(f)(1)] upon which the servicer has [determined that it need not apply]." 12 C.F.R. § 1024.36(f)(2). PennyMac does not discuss § 1024.36(f)(2), and there appears to be only a handful of cases directly addressing

36

this provision. At least one court has stated that § 1024.36(f)(2) "make[s] clear that when a servicer determines that borrower correspondence is not a [QWR] the servicer should respond justifying its position that is so." Citibank, N.A. v. Najda, No. CV 14-13593-GAO, 2017 WL 1186318, at *4 (D. Mass. Mar. 29, 2017) (citation omitted). And two others have denied motions to dismiss based on a failure to comply with § 1024.36(f)(2). See Mcmahon v. JPMorgan Chase Bank, N.A., No. 2:16-CV-1459-JAM-KJN, 2017 WL 1495214, at *5 (E.D. Cal. Apr. 26, 2017); Martins v. Wells Fargo Bank, N.A., No. CV CCB-16-1070, 2016 WL 7104813, at *8 (D. Md. Dec. 6, 2016). This court does likewise, without prejudice to PannyMac raising this argument on a more developed record.

While PennyMac did respond to the other letters, the record is similarly insufficiently developed for the court to determine whether these responses fully complied with RESPA. The parties have provided the responses themselves, but not the documents PennyMac produced in conjunction with those responses. Without the benefit of reviewing those documents, the court declines to rule, in the context of a Rule 12(b)(6) motion, that the responses themselves were sufficient.

Finally, PennyMac contends that Moody has failed to plausibly allege damages under Count 8.[94]  RESPA allows for the recovery of "any actual damages to the borrower" and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance . . . in an amount not to exceed $2,000."  12 U.S.C. § 2605(f)(a)(A)-(B).  As to the latter, this court has previously held that a servicer's failure to respond to two letters does not make out a pattern or practice of noncompliance with RESPA.  See Moore, 848 F. Supp. 2d at 122.  Here, however, Moody alleges that PennyMac failed to respond, or to adequately respond, to five letters.  Thus, Count 8 may proceed, at least for now, under a "pattern or practice" theory.

With regards to actual damages, Moody alleges, in each of his RESPA counts, that PennyMac's conduct resulted in him, among other things, "losing [his] real property" and "incurring emotional distress."[95]  This court has previously construed § 2605(f)(1)(A) broadly to include "any actual damages to the borrower" caused by the RESPA violation, including emotional

---

[94] Keeping with PennyMac's decision to present this argument solely with respect to Count 8, the court elects to discuss it here.  But given that the court is allowing Moody's § 1024.41 claim to proceed, that claim, too, can inform the availability of damages under RESPA.

[95] Compl. (doc. no. 69) ¶¶ 147, 164.

distress.  [Moore, 848 F. Supp. 2d at 122-23](#) (emphasis in the original).  Here, Moody has plausibly alleged a causal connection between PennyMac's purported violation of § 1024.41 and the loss of his home.  He has similarly plausibly alleged that that violation, as well as PennyMac's purported failure to respond to his QWRs, caused him emotional distress.  The court therefore also allows Moody's RESPA claims to proceed on an actual damages theory.

## II.  Rule 12(b)(7)

The court turns to PennyMac's contention that Moody failed to join a necessary party.  PennyMac specifically contends that Moody failed to join McKenzie.[96]  In response, Moody contends that he "was precluded from joining [McKenzie] . . . because during eviction proceedings [in state court], the [d]efendants coerced [McKenzie] into executing an Agreement For Judgment . . . in which [McKenzie] gave up [his] rights to be a party to [this action]."[97]  Moody attached a copy of the "Agreement for Judgment" to his objection.[98]  PennyMac argues for the first time in its reply that this Agreement bars Moody's current action, as he was named as a defendant in the eviction

---

[96] Defendants' Mem. (doc. no. 70-1) at 19-20.

[97] Obj. (doc. no. 72) at 1.

[98] See Obj. Ex. 1 (doc. no. 72-1).

action and the Agreement includes a broad waiver of future claims related to the subject property.[99]

"Failure to join a party under Rule 19 is grounds for dismissal under Rule 12(b)(7)." Spencer v. Eversource Energy Serv. Co., 2017 DNH 212, 9. "Rule 19 addresses circumstances in which a lawsuit is proceeding without particular parties whose interests are central to the suit." Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 15 (1st Cir. 2008). It provides for the joinder of such "required" parties when feasible. Fed. R. Civ. P. 19(a)(2). Dismissal is appropriate when the court determines that the joinder of the "required" parties is not feasible, but that they are, nonetheless, so "indispensable" that the suit must not be litigated without them. Fed. R. Civ. P. 19(b).

The court cannot determine, based on the information before it, whether Moody's failure to join McKenzie is fatal to his cause of action. The parties devote limited attention to this issue in their briefing, and it is unclear from the pleadings whether McKenzie is a required party, let alone whether he is so indispensable that this action cannot proceed without him. Nor is it clear how the Agreement impacts this determination. PennyMac's argument that the Agreement bars Moody from bringing

---

[99] See Defendants' Reply (doc. no. 75) at 1-2.

40

this action, raised for the first time in its reply to Moody's objection, is similarly underdeveloped.

The court therefore denies PennyMac's motion to the extent it is brought under Rule 12(b)(7), albeit without prejudice to any party raising arguments related to McKenzie and/or the Agreement later in this litigation.

## III. **Conclusion**

For the reasons set forth above, PennyMac's motion is GRANTED in part and DENIED in part.  As brought under Rule 12(b)(6), the court GRANTS the motion as to Counts 2, 3, and 5, and GRANTS-IN-PART the motion as to Counts 1 and 4.  The court otherwise DENIES the motion on Rule 12(b)(6) grounds.  The court also DENIES the motion to the extent brought under Rule 12(b)(7).

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Dated:    March 27, 2018

cc:  Dana E. Moody, pro se
     Kevin P. Polansky, Esq.

41